## KIDDER OIL CO. v. FEDERAL TRADE COMMISSION.

### No. 7140.

Circuit Court of Appeals, Seventh Circuit.

Jan. 15, 1941.

Rehearing Denied Feb. 28, 1941.

Robert J. Weiss, of Chicago, Ill., for petitioner.

Wm. T. Kelley, Chief Counsel, and Martin A. Morrison, both of Washington, D. C., for respondent.

Before SPARKS, MAJOR, and ·KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition to review a cease and desist order of the Federal Trade Commission, (hereinafter called the "Commission") issued September 19, 1939, in a proceeding had under Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45. The controversy before the Commission, as here, was, in a broad sense, whether colloidal graphite in petitioner's product, known as "Koatsal," when added to lubricating oil in internal combustion engines, has the effect of substantially diminishing friction and reducing wear of the engine parts which move upon or against one another.

The issues involved arise from the complaint filed by the Commission, and petitioner's answer thereto. By the latter's answer, certain charges of the complaint were admitted and petitioner consented that a cease and desist order be entered in conformity thereto. It will only be necessary, therefore, to refer to the charges of the complaint which were denied by petitioner's answer. This portion of the complaint is as follows:

"In the course and conduct of its said business, as hereinabove described, respondent, in soliciting the sale of, and in selling its product, 'Koatsal,' by pamphlets, labels attached to containers of the product, letters, post cards, testimonials, advertisements inserted in newspapers, periodicals, and magazines, and otherwise, has made extravagant, deceptive, misleading, and false statements and representations regarding the value, efficacy, and effect of its said product, and the results that are achieved by using it, among which are the following:

\*     \*     \*     \*     \*     \*

"(b) That 'Koatsal' performs amazing feats of lubrication never before possible and utterly impossible by any other method, that it perfects lubrication and is more efficient than any other method because it is scientifically correct;

\*     \*     \*     \*     \*     \*

"(d) That 'Koatsal' penetrates and adheres to all metal surfaces it reaches, 'actually becomes a part of the metal, permeating the pores \* \* \* literally "soaking" into it,' that the metal becomes plated with it and that moving parts ride on this plating;

"(e) That 'Koatsal' reduces friction as much as 50%, provides perfect protection against burned out bearings and makes metal self-lubricating;

\*     \*     \*     \*     \*     \* "

The portion of the cease and desist order now in controversy precludes petitioner, in connection with the offering for sale, sale

and distribution of its product "Koatsal," whether sold under that name or under any other name, from representing:

" * * * * * *

"(2) That Koatsal penetrates and adheres to all metal surfaces it reaches, permeates the pores of the metal, soaks into the metal, and that the metal becomes plated with Koatsal and moving parts ride on this plating;

"(3) That an automobile conditioned with Koatsal will run any greater distance without oil in the crankcase without damage to any part than will an automobile conditioned with ordinary lubricating oil of the same quality used in Koatsal;

"(4) That the lubricating qualities of Koatsal are any greater than the lubricating qualities of the oil which it contains;

* * * * * * "

█ As is common in cases of this character, the primary question for decision is whether the findings of fact as made by the Commission, upon which the cease and desist order is predicated, are sustained by substantial evidence. Other incidental issues, perhaps not necessary for decision of the main issue, are (1) whether the report made to the Commission by its Trial Examiner, who heard the witnesses, may properly be considered, and (2) whether this court should make certain findings of fact which were proposed to the Commission by the petitioner and which it is claimed were not included in the findings as made. We shall first discuss these incidental issues.

The Trial Examiner made an original report February 1, 1937. Thereafter, additional evidence was taken and the Examiner filed a supplemental report September 16, 1937, neither of which was incorporated in the transcript, certified and filed by the Commission. Upon a supplemental petition filed by petitioner, this court directed the Commission to certify the reports made by the Trial Examiner without prejudice, however, to the right of the Commission to renew its objection to our action in this respect. The reports are here, and it is again contended by the Commission that, under the statute and rules of the Commission, they are no part of the record. The statute, section 5 (c) provides that the Commission "shall certify and file in the court a transcript of the entire record in the proceeding, including all the evidence taken and the report and order of the Commission." It further provides that the court "shall have power to make

and enter upon the pleadings, evidence, and proceedings set forth in such transcript a decree * * *." Rule 13 of the Commission's rules, adopted May 21, 1938, provides: "The Trial Examiner's report upon the evidence is not a decision, finding, or ruling of the Commission. It is not a part of the formal record in the proceeding, and is not to be included in a transcript of the record." It is pointed out by the Commission that there is no provision in the statute for a report "upon the evidence" by the Trial Examiner, that such report is provided for only by the Commission rule which expressly states that such report is not a part of the record to be included in the transcript, and that, therefore, it is not required. Three cases are cited which it is claimed sustain this position. Algoma Lumber Co. et al. v. Federal Trade Commission, 9 Cir., 56 F.2d 774, Arrow-Hart & Hegeman Electric Co. v. Federal Trade Commission, 2 Cir., 63 F.2d 108, and Federal Trade Commission v. Hires Turner Glass Co., 3 Cir., 81 F.2d 362. In the Algoma case, the holding was to the effect that it was not incumbent upon the Commission to certify the Examiner's report unless such report was referred to in the findings of the Commission. That was not done there, nor is it done here, but the court further held that as to whether the Examiner's report should be subsequently certified, was a matter resting in the Court's discretion. In the Arrow-Hart case, it was held that the Commission was not required to certify the Examiner's report unless such report was referred to in the Commission's finding. In the Hires case, the court denied a request that the Commission be required to certify the report of the Trial Examiner.

██ The Examiner is an agent of the Commission, appointed, and with authority to conduct the hearing and make a report. It is the practice, as we understand—at any rate it was done in the instant case—when his report is filed with the Commission that a copy be served upon the interested party. Exceptions are, and in this case were, filed to such report. An argument was had before, and brief submitted to the Commission in support of the exceptions thus made. The statute requires a "transcript of the entire record in the proceeding" and we think that the report thus became a part of the record in the proceeding, which, by the statute, was required to be certified. If we are right in this construction of the statute, the provision of

the Commission rule—"It is not a part of the formal record in the proceeding, and is not to be included in a transcript of the record" is in conflict with the statute and of no effect. Assuming, however, that the statute is not susceptible of such construction, we further are of the opinion that it is a discretionary matter with the court, properly exercised in the instant case. Such conclusion is not inconsistent with our statutory duty to accept the findings of the Commission as to the facts if supported by substantial evidence. In the instant case, the findings of the Commission, upon which its cease and desist order rest, are at variance with the facts as reported by its Examiner. The Commission undoubtedly had the right to make findings contrary to the facts as reported by its Examiner, but that does not preclude us from considering such report in connection with our determination as to whether such findings are substantially supported. In Staley Manufacturing Company v. National Labor Relations Board, 117 F.2d 868, decided by this court November 14, 1940, in considering a similar situation, we said:

"* * * In the same connection, while the report of the Examiner is not binding on the Board, yet where it reaches a conclusion opposite to that of the Examiner, we think the report of the latter has a bearing on the question of substantial support and materially detracts therefrom."

Before considering petitioner's request that this court approve certain findings of fact which it proposed to the Commission, it seems appropriate to make some further statement concerning petitioner's product "Koatsal" as well as the use for which it was intended. Colloidal graphite is a product of the high-temperature furnace, consisting of pure graphite, which is an allotropic form of carbon subdivided into particles so small and fine that they can be suspended in oil, water, or other liquid medium and remain for a long time in suspension therein in a manner close to and having many properties of a true solution. Petitioner's product, which is an oil containing such graphite, is sold for comingling as an auxiliary or adjunct lubrication to the mineral oil which is universally used to lubricate engines. It is the colloidal graphite in the product, which, according to petitioner, produces the beneficial effect. It is generally recognized that in operating an automobile engine, it is dangerous to permit the supply of oil to diminish beyond a certain point; that, if the supply of oil reaches a certain lower limit, the scoring and wearing of cylinders, piston rings and bearings are likely to occur; that the engine without sufficient oil will heat, causing it to "seize" and be subjected to various other injurious effects. It is also generally recognized that there are two conditions of lubrication in an internal combustion engine which are known as "full-film" and "boundary" conditions. While this distinction apparently has a material bearing upon the findings of the Commission upon which its cease and desist order was issued, it is not necessary to review or quote the testimony of numerous witnesses in this regard for the reason that both the Examiner, in his report, and the Commission, in its findings, recognize such distinction. The following statement is from the Commission's findings:

"The primary function of any lubricant in aeroplane and automobile motors is to reduce friction. Friction is waste work and is reduced by the forming of a film of lubricant between the stationary and moving parts of a bearing holding them apart. There is practically no contact of metal to metal when a full film of lubricant is maintained between the moving and stationary surfaces. However, within this lubricating film particles next to the moving surface are in motion and those next to the stationary surface are stationary so that there must be a constant shearing of the film, which action transforms work into heat. Twice in each revolution, each piston pauses momentarily as it reverses direction. During that pause the tension in the rings tends to force out any lubricant between rings and the cylinder walls. In any automobile or aeroplane motor, even when running under full film conditions, there is a momentary shearing of the film.

"When an automobile is given a fresh charge of lubrication, the film is as full as it is possible to maintain between the metal surfaces. This is called full film lubrication. As the lubricant is consumed and only a thin film exists, boundary conditions are approached. Boundary condition is that stage of lubrication when the film is negligible."

The Commission also recognized that "boundary" conditions of lubrication occur under a variety of circumstances. Regarding such conditions, the following statement is made in its findings:

"Boundary conditions are often brought about by lowering the viscosity of the

lubricant, the introduction of grit between the surfaces and (of) the fluctuating temperatures under the wide range of speed and load of a motor. There are many other factors which cause boundary conditions."

Some of the "other factors" referred to by the witnesses are—"when a person starts his engine on a cold day in the winter time, boundary lubrication undoubtedly exists in the engine, since the oil is not able to get to the surfaces for some little time after the engine is started"; "excessive use of the choke would give a momentary low viscosity to the oil on the cylinder walls brought about by dilution of the oil with gasoline," and "Throughout the ordinary life of an automobile engine, in ordinary operation, there will be frequent conditions of boundary conditions of oil lubrication. I think it happens all of the time. The fact that you do get wear continuously in any engine shows that it is always present."

▉ Petitioner submitted to the Commission eleven proposed findings covering many of the details involved in the controversy, which the Commission refused to accept or reject as presented. It is now urged by the petitioner that this court has the authority to make such findings and should do so in order that the controversy be ended. In this respect, Federal Trade Commission v. Curtis Co., 260 U.S. 568, 580, 43 S.Ct. 210, 213, 67 L.Ed. 408, is relied upon. The language used indicates that the court has the authority to make additional findings, but at the same time the court states: "* * * the matter may be and ordinarily, we think, should be remanded to the commission—the primary fact-finding body—with direction to make additional findings, * * *."

Assuming that the court has such authority, we are of the opinion that it should be exercised, if ever, only in cases where the findings, as made by the Commission, are insufficient to dispose of the issues presented. In the instant case, we do not think that this can be said. It is true that

many details incidentally involved are not determined by the Commission, but we know of no law or rule which imposes such requirement.

We are convinced that the findings as made by the Commission effectively dispose of all material issues adversely to petitioner. In order to illustrate this statement, we will refer to proposed findings 2 and 6, which furnish the strongest support to petitioner's contention.[1]

The Commission found: "that the viscosity and other properties and qualities of a film of lubricant are unaffected by the presence of the colloidal graphite in 'Koatsal' whether a motor is operated under full-film or boundary conditions. 'Koatsal' has the same qualities, properties, and characteristics as the oil therein contained has and no more. Its effect upon the metal surfaces of a bearing is the same effect as is produced by the oil therein contained and no more.

"In tests made on bearings with plain oil and also with graphite oil, it has been determined that in the presence of an ample supply of oil, 'Koatsal' has no measurable effect on the friction, power, or economy of a gasoline engine. No reduction of friction is accomplished by conditioning a motor with 'Koatsal.'

"Tests were also made by running automobiles and bearings to destruction and comparisons made as to the effect of 'Koatsal' on durability of parts. It is determined from these tests that a bearing will run without substantial damage for an indefinite period after oil is drained from the crankcase so long as a film of oil is maintained between the moving and stationary surfaces of metal, whether the bearing has been conditioned with 'Koatsal' or not. It is also determined from tests that as soon as the film of oil is removed and boundary conditions exist that a bearing is quickly destroyed, whether previously conditioned with 'Koatsal' or not."

Petitioner argues that this finding is merely a blanket condemnation of its prod-

---

[1] 2. The colloidal graphite in Koatsal, when mixed in sufficient quantities in the lubricant of an internal combustion engine, becomes firmly affixed and adheres to the surfaces of the moving parts, forming on the surface thereof what is called a graphoid surface.

6. When colloidal graphite is mixed in sufficient quantities in the lubricant of an internal combustion engine or in its

gasoline fuel, it brings about, under boundary conditions of lubrication, a substantial reduction in the friction developed between the surfaces in moving contact with each other to a degree which the tests and experiments made fix as in the neighborhood of 50%, the result of one of such experimental tests being a reduction of exactly 50% in wear of the moving parts.

uct, with neither an affirmative or a negative finding by the Commission as to any one or more of the proposed findings submitted. As stated, this is not a detailed finding, as requested, but there can be no doubt but that it effectively disposes of all material issues adversely to the petitioner. In other words, according to the findings as made, petitioner's product is without merit, has none of the advantages claimed for it, and the benefits produced by its use are nil. This is so whether the existing conditions of lubrication are "full-film" or "boundary" conditions.

It is upon this basis that we approach the primary issue as to whether such finding is supported by substantial evidence. In doing so, it should be kept in mind that petitioner, before the Commission, and here, relies chiefly upon the claim that its product is beneficial when a motor is operated under "boundary" conditions. The theory and claim is that under "full-film" conditions, there is a complete separation of the contacting surfaces by an oil film, and that under such circumstances, the colloidal graphite does not come into play. On the other hand, so it is claimed, the graphite forms a graphoid surface on the contacting parts so that when boundary conditions exist, the oil film is held in close contact with the graphite layer thus formed, thereby preventing friction and wear.

The Commission relies largely, if not entirely, upon its Exhibit 19, together with the testimony of two witnesses, Dill and Brooks, as furnishing competent, substantial evidence to support the findings as made. Exhibit 19 is a report on tests made by the United States Bureau of Standards of Pyr-Oil, manufactured by the Pyr-Oil Company of LaCrosse, Wisconsin.[2] That company had distributed through the mails advertising matter in which representations were made for Pyr-Oil similar to those made by petitioner for its product. The tests were made at the request of the Post Office Department with a view of ascertaining whether the representations made by the manufacturer of Pyr-Oil were violative of postal regulations. The Commission in its brief states that the conclusions drawn by the experts from this report, are:

"1. In the presence of an ample supply of oil, Pyr-Oil has no measurable effect on the friction, power, or economy of a gasoline engine.

"2. No reduction of friction whatever was found after the engine had operated the equivalent of more than 1,000 miles as directed."

It will be noted that such conclusions are predicated upon the "presence of an ample supply of oil," while the findings of the Commission are applicable to a motor operated under either "full-film" or "boundary" conditions. In either case, so the findings state, "its effect upon the metal surfaces of a bearing is the same effect as is produced by the oil therein contained and no more." While the Commission, in its findings, as stated heretofore, recognized the distinction between "full-film" and "boundary" conditions, it appears to have completely ignored such distinction in its findings and in its argument presented to this court as to the benefits claimed by petitioner for its product with a motor operated under "boundary" conditions.

Brooks arrived at the following conclusion from the tests made: "I would say it is quite obvious that the use of Pyr-Oil in our destruction tests did not result in the engine operating materially longer."

The Commission states in its brief:

"* * * No evidence has been obtained by the Bureau of Standards that the use of graphite in the oil will lower friction in engine bearings when the engine is operated under full-film conditions.

"A witness for the petitioner testified that graphite in the lubricant would have no effect at all if the condition remained full-film lubrication. * * *"

The tests, as made by the Bureau of Standards, were not made with a motor in use upon a highway, but upon a Ford engine set on four pedestals and connected to an electric dinamometer. The report is of such length that we would not be justified in discussing it in detail. The report plainly discloses that the tests were conducted under conditions with a normal supply of oil. The report contains this statement.

"* * * It would appear then, that for an engine operating normally, a liquid lubricant is necessary to dissipate the heat whether Pyr-Oil is used or not and that in the presence of the liquid lubricant, the Pyr-Oil is superfluous.

[2] It was stipulated that the percentage of colloidal graphite in Pyr-Oil, as tested by the Bureau of Standards, is the same as that contained in "Koatsal" as sold and distributed by the petitioner.

"The fact that engine parts wear is evidence that contact of moving parts does occasionally occur. It is possible that at such times a graphitic film on the surfaces would to some extent at least, protect them. However, as a comparative test for wear in normally operated engines would cover a very long period of time, no such test has been attempted. * * *"

The Auto Mechanics Department of the North Dakota Agricultural College conducted a test of Pyr-Oil and reached a conclusion as to its benefits contrary to that reached by the Bureau of Standards. In the report of the latter, in discussing the former, it is said:

"* * * The graphite deposited from the Pyr-Oil probably lubricated the bearing and enabled it to run longer and with less friction after the supply of oil had been cut off than would the small amount of oil which remained in the bearing alone. Bearings can undoubtedly be designed to run with graphitic lubrication alone. However, such a bearing would be incapable of sustaining loads comparable to those which can safely be put on an equal bearing lubricated with oil. The bearing in which the test was made at the North Dakota State College would probably have done as well with any form of graphite lubricant. * * * The possible benefit of the graphite would occur if for any reason the oil supply should so diminish that metallic contact would occur in the absence of the graphite. * * *"

The witness Dill testified: "* * * I am not a lubricating expert. I am not an expert on matters of lubrication of internal combustion engines, so that I have no idea what 'boundary lubricating conditions' in regard to internal combustion engines means. * * * At all times during our test, we had a full and ample supply of oil film, so that the oil film was there and not broken. * * *"

At one point in his testimony, the witness Brooks stated: "I formed the opinion as the result of my tests and calculations that it was unlikely Pyr-Oil would be strongly beneficial in an engine."

The witness Dill also stated: "I can tell you that the engine ran approximately 10 minutes after the run without Pyr-Oil and approximately 12 minutes on the run with Pyr-Oil. That is just brute memory without any notes to refresh my recollection. It is of some tests I made seven years ago. I have run quite many tests on various matters since 1931. * * * I was first approached with regard to my being a witness in this proceeding last week. Then I first started to think again about Pyr-Oil."

Again this same witness, when interrogated concerning Commission's Exhibit 19, answered "Yes" to the following question: "And you say, elsewhere in the report, that, 'The fact that engine-parts wear is evidence that contact of moving parts does occasionally occur. It is possible that at such times a graphitic film on the surfaces would to some extent, at least, protect them.'"

As to one test conducted by the Bureau of Standards, the witness answered "Yes" to the following question: "And you found in this case that the difference favored the use of Pyr-Oil by about 40 per cent"?

There also appears questions and answers as follows:

"Q. You draw the conclusion, then, that with Pyr-Oil added to the oil, before you drain the crankcase and eliminate the oil, you would not expect that it would run ten times as long as if the Pyr-Oil had not been put in? A. That is my conclusion, to the best of my belief.

"Q. And that is as far as you can go with this test? A. Entirely."

From a study of Commission's Exhibit 19, and the testimony of Brooks and Dill, we have little hesitancy in reaching the conclusion that they afford no substantial support for the Commission's conclusion that petitioner's product is without merit. Certainly they fail to furnish even a scintilla of support that the product is without merit when used under "boundary" conditions. In fact, neither the report of the Bureau of Standards nor the testimony of these witnesses purport to relate, to a test made under such conditions. On the contrary, they expressly limit themselves to a motor operated with a normal supply of oil, or under "full-film" conditions. Even when the product was employed under "full-film" conditions, the result of their test, according to the report and testimony, is anything but certain. They do not claim that the product is without benefit, but dispute that it is "strongly" or "materially" beneficial.

It is also of some significance that the tests upon which the Commission relies were made more than seven years previous to the hearing. Much of the testimony of Brooks and Dill was from memory, which

perhaps accounts for their uncertainty and indecision in numerous respects. It is no reflection upon the Bureau of Standards for us to conclude that the report and testimony concerning such tests are far from convincing. In this connection, it is difficult to understand why the Commission would go to hearing on such an important controversy, relying upon tests so uncertain and dubious both in their nature and result. A study of the record is convincing that the overwhelming weight of the testimony is contrary to the Commission's contention, and under such circumstances, it occurs to us that the Commission would have discerned the importance, and perhaps the necessity, of making such tests and experiments as would demonstrate, at least to a reasonable certainty, the validity of the charge which it had the burden of sustaining.

We think it is also relevant to point out that whatever probative value may be attached to the Commission's Exhibit 19, and the testimony of Brooks and Dill, is materially weakened by the Commission's Exhibit 6. This was a circular letter issued by the Bureau of Standards revised to April 3, 1934, which was subsequent to the tests referred to in Exhibit 19, and those made by Brooks and Dill. This circular letter was issued, so it was stated, in response to numerous inquiries regarding various lubricants containing graphite. To our minds this letter completely illustrates the fog of uncertainty and indecision which prevails in the Bureau of Standards concerning the results attending the use of graphite in lubricants. They again reaffirm their negative conclusion: "No evidence has been obtained that the use of graphite in the oil will lower friction in engine bearings, when the engine is operated under full-film conditions." The letter goes on to state: "When graphite is added to the mineral oil * * * the viscosity of the oil after mixing is lower than the viscosity of the original oil." At a later point in the letter is this statement: "No appreciable increase in engine horse power or in maximum car speed would be expected as a result of using graphite in an engine in good mechanical condition, unless the blending with the graphited preparation produces a decrease in viscosity." Taking these two statements together, they seem to lead to the incongruous result that the addition of graphite decreases the viscosity of the oil, but that no benefit will result from its use unless it produces such

decrease. At another point, the letter states: "It is known that graphite tends to fill up the pores of cast-iron surfaces and to adhere very tenaciously. This may result in a somewhat smoother surface and may produce a slight lowering in the friction. * * * The use of a lubricated gasoline may be of some benefit in tending to reduce the wear on the piston rings and cylinders." Thus, all through this letter, as in Exhibit 19, and the testimony of Brooks and Dill, the information (if it may be called such) is what graphite may or might do, rather than what it does or does not do. Information of such a speculative and uncertain nature can afford little, if any, support to findings based thereon.

The report of the Commission's Examiner is before us and contains an exhaustive and, we think, accurate review of the evidence in the case. We shall not refer to the conclusion reached by the Examiner, except to state that his findings of matters material to the instant order are at variance with the findings of the Commission. As we have already said, the Commission is not bound by the findings of its Examiner, but under the circumstances of this case, we think the Examiner's report materially detracts from the Commission's claim that its findings are substantially supported. We recognize that our province is not to weigh the testimony, but we think it is not inappropriate to briefly refer to some of the direct positive testimony which contradicts many of the uncertain statements made by the witnesses relied upon by the Commission, and the inferences indulged in by such witnesses. In fact, the testimony of numerous of the Commission's witnesses is at variance with its findings, and contradicts the inferences of the witnesses Brooks and Dill, relied upon by the Commission.

Professor Linsenmeyer, a Commission witness, is head of the Mechanical Engineering Department at the University of Detroit, and has been for fourteen years. He has made extensive studies of lubricants. In one test he took two new Ford automobiles directly from the factory and drained the lubricant from both cars. One car was then filled with a colloidal graphite treated oil, and the other with an ordinary high-grade motor oil. The cars were driven upon the highway in a test under the same or similar conditions. The car with ordinary motor oil was destroyed at a distance of 3,739 miles, and the car contain-

ing the colloidal graphite was driven a distance of 5,058 miles, at which time the drain plug was removed and the car operated a further distance of 16 miles. Regarding petitioner's claim that its product reduces friction as much as 50%, the witness testified:

"Well, the fact that we did get this improved economy and the decrease in friction, of my value of 36%, I think would not invalidate the claims of 50, for, after all, our condition was at the one speed. Perhaps if we had selected another speed it would have been a little more than 36%, so it met these claims of 50%. I think that is merely relative. I do know it would improve the frictional properties to a substantial amount."

Raymond Szymanowitz, another Commission witness, is a technical director of the Acheson Colloids Corporation. He has a degree of Bachelor of Science from Cooper Union. His experience has been extensive in the industrial field, and he has made special studies in connection with colloidal graphite. He testified concerning comparative tests of plain oil and graphited oil. In each case the oil supply was shut off after the motor had operated for thirty minutes. The result of these tests was illustrated by Commission's Exhibit 1. Referring to this Exhibit, the witness said: " * * * You will see in the case of the plain oil, there was a minimum rise in friction to seizure at this point. However, when the graphited oil was used the supply cut off at the same time, it continued to run and seizure took place I believe in 26 hours."

At another point this witness was asked: "Do you have any data showing the effect of what protection against burned out bearings colloidal graphite can give"? and he answered: "Well, the graph which I have referred to as Commission's Exhibit No. 1, for identification, you will note the line showing the point at which the oil supply became first exhausted or seriously diminished. In that particular exhibit you will find a graph which shows that even in the absence of oil the graphite has permitted the bearing to function unimpaired for quite a few hours."

He further related that the cars used in the test were run a certain distance, and at the end of that time the oil was removed from the crankcase. After the oil was thus drained, the cars whose lubricant had been treated with colloidal graphite would run as far as 47 miles. Concerning petitioner's representation that the use of colloidal graphite results in a car running an amazing distance without oil, the witness said: "It depends on what you mean by the words 'amazing distance.' Some people might think that was amazing as a distance. * * * "

Frank S. Spring, another witness for the Commission, is the automobile engineer for the Hudson Motor Car Company, and has had experience with lubricants and colloidal graphite in motor cars. He testified—"We have made various tests with it, and we find it is rather difficult to come to any very definite conclusions, because the difference between ordinary lubricant and a lubricant when this colloidal graphite is added, is not as great as the difference in the ordinary run of automobile engines. I think it is beneficial in new engines during the run-in period. We have made perhaps 100 tests, and my conclusion is that it is beneficial on new cars or new engines until they are well broken in."

It will be noted that so far we have alluded only to the testimony of witnesses for the Commission, and certain of its Exhibits. To go further might subject us to the criticism of weighing the testimony, which we are endeavoring to avoid. We shall, therefore, only make brief reference to the voluminous testimony, oral and documentary, offered by the petitioner.

Among such witnesses is George A. Abbott, head of the Chemical Department of the University of North Dakota. As a chemist of wide experience, he has interested himself for many years in lubricating problems, including that of colloidal graphite. He testified as to its beneficial effect, and, in substance, that colloidal graphite actually penetrates the metal with which it comes in contact. He further gave it as his opinion that the word "adsorption" was preferable to the word "penetrate."

C. G. Williams, Director of Research of the Institution of Automobile Engineers, testified that tests made by him disclosed that the addition of colloidal graphite to fuel brought about a reduction in wear ranging from 12 to 37 per cent for the piston rings and ranging from 27 to 50 per cent for the cylinder wear.

Petitioner's Exhibit 3 is an article on "The Graphoid Layer on Bearing Surfaces" by Professors Finch and E. J. Whitmore, scientists of England. This article

discloses that experiments with bearing surfaces lubricated with oils containing colloidal graphite point to the formation of an extremely thin and adherent layer parallel to the surface, and that its effect persists long after the supply of liquid lubricant is removed.

Doctor Charles F. Mabery, Professor of Chemistry, Case School of Applied Science, Cleveland, Ohio, in a paper before the American Society of Mechanical Engineers, states: "* * * Natural graphite serves an excellent purpose on cast-iron bearings, acting as a surface evener of the porous metals. * * *"

He further states: "There is probably no variety of lubrication in which colloidal graphite shows its economic value to better advantage than in reducing the friction on automobile bearings. * * *"

T. C. Thomsen, a chemist of repute, with reference to tests conducted by him, said: "* * * The tests showed that with colloidal graphite the piston-ring wear was halved."

Professor Erwin H. Hamilton, Associate Professor of Automotive Engineering at the New York University, testified that as a result of a number of researches and tests for various companies "an automobile conditioned with colloidal graphite will run longer—a greater distance without oil in the crankcase, without damage to the parts, than will an automobile conditioned with ordinary lubricating oil. * * *"

A number of other witnesses gave testimony to the same effect. In addition, numerous articles from engineering, automobile and mechanical publications were offered in evidence in support of the claim made by the petitioner as to the beneficial results attained from the use of its product.

The conclusion follows, from what we have said, that the Commission's findings that petitioner's product produces no beneficial result under "boundary" conditions of lubrication, is without substantial support. On the other hand, the record convincingly discloses to the contrary. There is a difference of opinion, however, as to the extent of such benefits. This difference of opinion exists largely among petitioner's witnesses, as the Exhibits and witnesses relied upon by the Commission dealt mostly, if not entirely, with the effect under "full-film" conditions of lubrication. Petitioner's representation that its product will enable a motor car to operate an "amazing distance" without oil, or that its product is a "perfect" lubrication, evidently is some exaggeration. To what extent, however, it is difficult to say. Such terms are largely a matter of personal opinion. What might be an "amazing distance" to one person might cause no surprise to another. So far as we know, there is nothing "perfect" in this world, but still it is a common term, which undoubtedly means nothing more than that the product is good or of high quality. We can conceive of situations where the use of such words might be deceptive and even fraudulent. As used by petitioner, however, we are of the opinion that they are nothing more than a form of "puffing" not calculated to deceive.

Paragraphs 1 and 5 of the Commission's cease and desist order are not in controversy in view of the admissions contained in petitioner's answer to the complaint. Paragraphs 2, 3, and 4 of the order, set forth heretofore in this opinion, can not be affirmed as written for the reason that the findings upon which they are predicated are not substantially supported. Such paragraphs, therefore, are modified so as to require petitioner to cease and desist in the manner provided only as to the representations concerning "Koatsal" when the same is used as a lubricant in a motor operated under "full-film" conditions.

The cease and desist order is modified as indicated, and as modified is affirmed.

### On Petition for Rehearing.

MAJOR, Circuit Judge.

We have before us a petition for rehearing, as well as a form of enforcement decree proposed by both petitioner and respondent. We are of the opinion that the decree proposed by the respondent is in conformity with our opinion. We held that the cease and desist order, concerning petitioner's product, when used under "boundary" conditions, was without substantial support. To go further is to enter a controverted field where we are not permitted, and did not intend, to enter. In other words, the testimony as to the effect of the product in question under "full film" conditions is in dispute and we did not hold that the evidence was insufficient to sustain respondent's order in this respect. The decree proposed by the petitioner, as contended for in its petition for rehearing, would require a holding in its favor when its product is used under "full film" as well as under "boundary" conditions. This argument was given due con-

905

sideration in the opinion and decided adversely to petitioner.

Our attention is called to an apparent error on page 2 of the opinion. The controverted issues are there stated under subdivisions (b), (d) and (e), which should be (d), (e) and (f). (b) is therefore eliminated and there is inserted in its place:

"(f) That an automobile conditioned with 'Koatsal' can run an amazing distance without oil in the crankcase without damage to any part."

The petition for rehearing is denied, the decree proposed by petitioner refused, and that proposed by respondent approved.