**HARTFORD ELECTRIC LIGHT CO. v.
FEDERAL POWER COMMISSION.**

No. 42.

Circuit Court of Appeals, Second Circuit.

Nov. 25, 1942.

954

E. Barrett Prettyman, of Washington, D. C. (Austin D. Barney and Hewes, Prettyman, Awalt & Smiddy, all of Hartford, Conn., of counsel), for petitioner.

Howard E. Wahrenrock, of Washington, D. C. (Charles V. Shannon and Howell Purdue, both of Washington, D. C., of counsel), for respondent.

John E. Benton and Frank B. Warren, both of Washington, D. C., for National Ass'n of Railroad and Utilities Commissioners, amicus curiae.[1]

Before L. HAND, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. The Commission, on June 16, 1936, made its Order No. 42, adopting a Uniform System of Accounts for Public Utilities and Licensees, subject to the provisions of the Federal Power Act, 16 U.S.C.A. § 791a et seq. By order dated May 11, 1937, the Commission directed all public utilities subject to its jurisdicton under that Act to submit certain data, statements and information concerning their accounts, records and properties. After notice and hearing, as required by the Act, the Commission, by orders dated February 25, 1941, and October 21, 1941, purporting to be entered pursuant to sections 208 and 301(a) of the statute, directed petitioner, Hartford, to

[1] The oral arguments and the briefs filed by the parties and amicus curiæ were excellent and exceedingly helpful to the court.

comply with Order No. 42 and the order of May 11, 1937. Petitioner asks this court to review and set aside the orders of February 25, 1941 and October 21, 1941, on the ground that, under the Act, petitioner is not subject to the Commission's jurisdiction in any respect.[2]

It is clear, and petitioner so concedes, that, if petitioner is a "public utility," as that term is defined in section 201 (e), then those orders are valid.[3] For section 208, found in Part II of the Act, and section 301 (a), found in Part III, each applies to "every public utility."[4] And section 201 (e), found in Part II, reads, "The term 'public utility' when used in this Part or in the Part next following [sections 824–825r of this title] means any person[5] who owns or operates facilities subject to the jurisdiction of the Commission under this Part [sections 824–824h of this title]."

The pivotal question is, then, whether petitioner owns or operates any facilities subject to the Commission's jurisdiction under Part II.[6] For answer to that question, we must turn to Section 201 (b), contained in Part II, which reads as follows: "The provisions of this Part [sections 824–824h of this title] shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this Part and the Part next following [sections 824–824r of this title], over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter."

---

[2] No question is raised as to the constitutionality of the Act.

[3] Jersey Central Power & L. Co. v. Federal Power Commission, 3 Cir., 129 F.2d 183, similarly approaches the question of the Commission's jurisdiction through a determination of whether a company is a "public utility" under Section 201 (e).

[4] Section 208 reads: "(a) The Commission may investigate and ascertain the actual legitimate cost of the property of every public utility, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property. (b) Every public utility upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction."

Section 301(a) reads: "Every licensee and public utility shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this Act [chapter], including accounts, records, and memoranda of the generation, transmission, distribution, delivery, or sale of electric energy, the furnishing of services or facilities in connection therewith, and receipts and expenditures with respect to any of the foregoing: Provided, however, That nothing in this Act [chapter] shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by licensees and public utilities and may classify such licensees and public utilities and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof."

[5] Section 3(4) defines "person" as used in the Act to mean "an individual or a corporation."

[6] Part II includes §§ 201 to 209 inclusive, 16 U.S.C.A. §§ 824–824h; Part III includes §§ 301 to 319, 16 U.S.C.A. §§ 825–825r.

2. The facts pertinent to this review may be summarized as follows:

Petitioner is a Connecticut corporation engaged in the business of generating, transmitting, distributing and selling electric energy in and near Hartford, Connecticut. It owns a steam-generating plant in Hartford. For some ten years before the President approved the Act, petitioner was a member of a voluntary arrangement for a "Pool" of electric energy known as the Connecticut Valley Power Exchange. The Exchange consisted of Massachusetts and Connecticut electric utility companies and was formed and operated for the purpose of exchanging electric energy, "at incremental cost," between the members. Through the operations of this Exchange, electric energy generated by petitioner was transmitted to, and sold to, customers in Massachusetts. Among the facilities used by petitioner in these transmissions of energy through the Exchange were these: (a) Facilities, owned by petitioner, between the connections on its generators in its generating plant and a substation immediately outside its generating plant. (b) That substation, owned by petitioner. (c) A transmission line, owned and operated by the Connecticut Power Company, connecting the substation with the facilities of a Massachusetts member of the Exchange.

In 1936, petitioner withdrew from the Exchange, Connecticut Power then succeeded it as a member of the Exchange, and petitioner then sold to Connecticut Power the substation and the facilities from its bushings on the wall of its generating plant to the substation. Since then Connecticut has owned and operated these facilities. Petitioner retained ownership and operation of the facilities in its gen-

erating plant, and between its generators and those wall bushings. The generators are connected to a "Main Bus" inside the generating plant. Numerous circuits connected to that bus are used solely in intrastate distribution and transmission; but there are three such circuits which lead through the wall bushings of the plant building to the substation; inside the building these circuits to the wall bushings are owned by petitioner, while outside they are now owned by Connecticut Power.

The 1936 sale of assets to Connecticut Power was admittedly made in the hope of escaping the Commission's jurisdiction. After that sale to Connecticut Power, no physical change was made in the transfers of energy under the Exchange arrangement, and the physical plan of operations of the Exchange continued as theretofore. Connecticut Power supplies to other Exchange members energy which it receives principally from petitioner, and receives from them energy, a considerable part of which it supplies to petitioner. Financial benefits, by way of savings, which had formerly accrued to petitioner as a member of the Exchange, now are received and retained by Connecticut Power. It is admitted by petitioner that it knows that the amount of energy it sells to Connecticut Power exceeds the latter's load requirements for its needs in the State of Connecticut; that such excess is utilized by Connecticut Power in connection with the operations of the Exchange; that, in such operation, energy is transmitted across the State boundary to Massachusetts, where it is used (except for losses) for sales to ultimate consumers; and that the supply of energy by petitioner is essential to the operations of the Exchange.[7]

---

[7] Petitioner's president testified as follows: "It is a fact known to the Company that the amount of energy sold by the Company to The Connecticut Power Company exceeds the territorial requirements of the latter, and that such excess is used by it, that is, by The Connecticut Power Company, in connection with the operation of the Connecticut Valley Power Exchange; and that in such operation energy is transmitted across the Massachusetts line; * * * The Company is the source of all the steam generated energy that The Connecticut Power Company delivers to the Connecticut Valley Power Exchange for transfer to Massachusetts and New York.

Practically all of the energy received by The Connecticut Power Company from the Connecticut Valley Power Exchange originates in Massachusetts. * * *"

"Q. Why do you permit The Connecticut Power Company, when convenient, to purchase the surplus electrical energy from the Hartford Company which you know it transmits across the State lines, as you have testified? A. Because when The Hartford Electric Light Company elected to divest itself of all interstate transactions and of any benefit therefrom, we would, if we had specified that power purchased from the Hartford Company should not be used for such purpose, have deprived the residents of the

Petitioner has a contract with Connecticut Power which obligates petitioner to supply Connecticut Power the firm capacity, up to a designated limit, required by Connecticut for its sales of energy to intrastate customers in a designated area. Outside its contract commitments, petitioner also sells Connecticut Power surplus energy. Were it not for this surplus energy thus sold by petitioner to Connecticut Power, the latter could not transmit energy under the Exchange arrangement. Although in this way energy generated by petitioner is transmitted and resold in Massachusetts, petitioner never sells any designated block of energy for specific interstate use. Connecticut Power may either distribute a particular purchase to its customers or put it in

---

territory contiguous to the Connecticut Valley of the benefits arising from the saving of large amounts of fuel and thus have acted to vitiate an obvious benefit to the public in this territory." Petitioner's executive vice-president testified: "The Hartford Electric Light Company is the main source of energy for The Connecticut Power Company in connection with The Connecticut Power Company's exchange operations."

The following colloquies occurred in the oral argument before the Commission:

"Mr. Prettyman (one of counsel for petitioner): I say that the physical movement, when we were a member of The Exchange, was the same as the physical movement since we have not been a member of The Exchange.

"Commissioner Scott: Let me put it in this way. Are not the various electrical facilities used in the process purely transferring devices, and is it not a fact that the entire combined process—electric, magnetic and mechanical—is integral, continuous and essentially simultaneous, and in the movement or transportation of this energy the same today as prior to 1936?

"Mr. Prettyman: Yes.

"The Chairman: And is not the timing of deliveries of such energy as does move over into Massachusetts the same as it would have been if the Hartford Company remained a member of The Exchange?

"Mr. Prettyman: That may be so. If the Hartford Company were a member of The Exchange today probably the timing would be the same as to the energy that would go to The Exchange.

"The Chairman: And it would go there for the same purpose?

"Mr. Prettyman: The ultimate purpose, yes.

"The Chairman: And the Hartford generating station would play the same part in the integration of power supply accomplished by The Exchange that it would have played if the Hartford Company had remained a member of The Exchange?

"Mr. Prettyman: The generating station of the Hartford generates energy that goes into The Exchange today, and the same thing would be true if it were a member of The Exchange?

"The Chairman: That is right.

"Mr. Prettyman: That is true. * * *

"Mr. Prettyman: The purpose of the whole system from generator to point of utilization is to get energy from the generator to the point of utilization, yes. There is no question about that.

"Commissioner Scott: In other words, all of these facilities are a part of a process which makes the ultimate utilization possible? But for the generation and its transfer over these other lines and its ultimate use at the other end there would be nothing for the consumer to use?

"Mr. Prettyman: There is no question at all about that. If there were nothing between the generator and the point of utilization the consumer would not get anything. There is no question about that. * * *

"The Chairman: Is it not true that all of the facilities involved in this transfer of energy generated in the Hartford station, and including the generating process in the Hartford station of energy that moves into Massachusetts, are used in precisely the same way, with precisely the same timing as they were used or would have been used if Hartford had remained a member of The Exchange?

"Mr. Prettyman: Yes; I think the answer to that is 'yes'—the physical operation, that is, the generation and transmission over the line, obliterating the difference in identification of the companies involved. But the physical aspects of the generation, et cetera, are probably the same, because the demands must be the same, that is, they are the same now as when Hartford was a member of The Exchange. * * *

"Commissioner Manly: Is there a sale of electric energy at wholesale in this case?

"Mr. Barney (one of counsel for petitioner): Yes.

"Commissioner Manly: There is a sale by the Hartford Company to the Connecticut Power Company?

"Mr. Barney: That is the sale at wholesale.

"Commissioner Manly: For resale?

"Mr. Barney: Oh, yes."

958

the transmission line to Massachusetts. Petitioner has no interstate energy business except in so far as its sales of energy to Connecticut Power transmitted to Massachusetts may, as "a matter of law" under the Act, constitute interstate transactions by petitioner.

Petitioner owns 9.19% of the common stock of Connecticut Power. Four of the eleven directors of petitioner are among the fourteen directors of Connecticut Power, and two of the principal officers of the two companies are the same.

Through the three circuits, above mentioned, which lead from petitioner's generating plant to the substation owned by Connecticut Power, 166,144,000 kilowatt hours of electric energy from petitioner's generating plant were supplied to Connecticut Power in the first nine months of 1939, of which 97,932,000 were transmitted to Massachusetts. From June 1 to September 30, 1939, approximately a third of the net generation at petitioner's plant was sent to Massachusetts.

3. Section 201(d) defines the "sale of electric energy at wholesale" to mean "a sale of electric energy to any person for resale." Petitioner sells electric energy to Connecticut Power. The Exchange arrangements result in resales, whether they be regarded as sales to the Exchange[8] and resales by the Exchange, or as sales by the Exchange as agent for the members, or as an agency whereby each member acts as agent for the others in selling the energy supplied by the others. For the inescapable fact is that energy sold by petitioner to Connecticut Power is resold to consumers in Massachusetts. There can be no doubt that petitioner is making sales at wholesale, as that term is defined in the Act.

Petitioner concedes that Congress has the constitutional power to regulate the sales transactions in which it is engaged, but argues that Congress has not exercised that power in this Act, because it has used the expression "in interstate commerce," a phrase, says petitioner, not sufficiently comprehensive to cover such transactions.[9] A similar contention was made in Peoples Natural Gas Co. v. Federal Power Commission, App.D.C., 127 F.2d 153, 155, in which a gas company had sold natural gas in Pennsylvania to another company which immediately transported the gas to New York, where it sold it to others for resale. The court rejected the argument, stating that the words "sale in interstate commerce" aptly described such a transaction.[10] We adopt that court's excellent discussion of the pertinent authorities. See also Shafer v. Farmers' Grain Co., 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909, and Flanagan v. Federal Coal Co., 267 U.S. 222, 225, 45 S.Ct. 233, 69 L.Ed. 583 (in both of which the court used the phrase "in interstate commerce"). Cf. Public Utilities Commission v. Attleboro Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549.

We are not to be taken as saying that a mere sale by A, within a state, to B, who ships the commodity in interstate commerce, would necessarily be a sale in interstate commerce; the character and extent of the seller's knowledge of the purpose of the purchaser to ship across state lines may be important. Petitioner, in support of its position that it has insufficient knowledge of the transmission to Massachusetts of the energy purchased from it by Connecticut Power, leans heavily on Superior Oil Co. v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 170, 74 L.Ed. 504, a case which, as the opinion shows, turned on its peculiar facts and which, as the court said, was "near the line."[11] There in

_____

[8] The Exchange agreement refers to "power purchased by the Pool" from "the company furnishing the power."

[9] We shall discuss below petitioner's additional contention as to the effect of the preamble, Section 201(a).

[10] The Natural Gas Act, 15 U.S.C.A. § 717 et seq. relates not only to the "transportation of natural gas in interstate commerce," but also to "the sale in interstate commerce of natural gas for resale * * *" and to "natural-gas companies engaged in such transportation or sale."

[11] In that case an oil company in Mississippi sold gasoline to shrimp packers.

The gasoline was delivered at the wharves of the packers' packing plants in Mississippi and was thence carried by the packers' boats to a "neighborhood" in Louisiana and there delivered by the packers to shrimp fishermen for use in fishing. The Oil Company, in each case of delivery, received from the packers a so-called bill of lading, signed by the master of the packers' boat on which the gas was loaded, purporting to show a consignment to the packers, to the Louisiana neighborhood as destination, on that boat; the bill of lading provided that the gasoline should remain the property of the Oil Company until delivered to the

holding that the intrastate sales of gasoline did not become sales in interstate commerce, so as to relieve the seller of taxes in the state where the sale took place, merely because the buyers transported the gasoline to another state for resale, the court, in an opinion by Holmes, J., said: "A distinction has been taken between sales made with a view to a certain result and those made simply with indifferent knowledge that the buyer contemplates that result. Louisville & Nashville R. R. Co. v. Parker, 242 U.S. 13, 14, 37 S.Ct. 4, 61 L.Ed. 119; Kalem Co. v. Harper Bros., 222 U.S. 55, 62, 32 S.Ct. 20, 56 L.Ed. 92, Ann.Cas. 1913A, 1285." The citation of the Kalem case (in which the opinion was also by Holmes, J.) illuminates the meaning of "indifferent knowledge"; for, in that case, it was said that "mere indifferent supposition or knowledge on the part of the seller that the buyer of spirituous liquor in contemplating such unlawful use is not enough to connect him with the possible unlawful consequences, * * * but * * * if the sale was made with a view to the illegal resale, the price could not be recovered."[12] [222 U.S. 55, 32 S.Ct. 21, 56 L.Ed. 92.]

consignee or its agent at such "destination," and that all risks should be upon the purchaser, the Oil Company paying no freight. The packers, when the gasoline was delivered at their plants, were free to do with it as they pleased. The court held that the sales by the Oil Company were not in interstate commerce and were, therefore, subject to be taxed by the State of Mississippi. The court said that the bills of lading seem "to have had no other use than * * * to try to convert a domestic transaction into one of interstate commerce. There was no consignee at the point of destination. * * * There was no point of destination for delivering of the oil but merely a neighborhood in which the packers that had bought it and already held it expected to sell it again. The document hardly can affect the case, because it is 'not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to state control, into an interstate commerce business transaction protected by the commerce clause;' * * * at least when the contract achieves nothing else." The court went on to say: "The importance of the commerce clause to the Union of course is very great. But it also is important to prevent that clause being used to deprive the States of their lifeblood by a strained interpretation of facts. We may admit that this case is near the line. There was a regular course of business known to the appellant, that took the gasoline into another State, and if by mutual agreement the oil had been put into the hands of a third person, a common carrier, for transportation to Louisiana the mere possibility that the vendor might be able to induce the carrier to forego his rights might not have been enough to keep the transaction out of interstate commerce. A. G. Spalding & Bros. v. Edwards, 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed. 865 (a case of foreign export, see Sonneborn Bros. v. Cureton, 262 U.S. 506, 520, 521, 43 S. Ct. 643, 67 L.Ed. 1095). But here the gasoline was in the hands of the purchaser to do with as it liked, and there was nothing that in any way committed it to sending the oil to Louisiana except its own wishes. If it had bought bait for fishing that it intended to do itself, the purchase would not have been in interstate commerce because the fishing grounds were known by both parties to be beyond the State line. A distinction has been taken between sales made with a view to a certain result and those made simply with indifferent knowledge that the buyer contemplates that result. Louisville & Nashville R. R. Co. v. Parker, 242 U.S. 13, 14, 37 S.Ct. 4, 61 L.Ed. 119; Kalem Co. v. Harper Bros., 222 U.S. 55, 62, 32 S.Ct. 20, 56 L.Ed. 92, Ann.Cas. 1913A, 1285. The only purpose of the vendor here was to escape taxation. It was not taxed in Louisiana and hoped not to be in Mississippi. The fact that it desired to evade the law, as it is called, is immaterial, because the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it. Bullen v. Wisconsin, 240 U.S. 625, 630, 631, 36 S.Ct. 473, 60 L.Ed. 830. But on the other hand the desire to make its act an act in commerce among the States was equally unimportant when it was apparent that the buyer's journey to Louisiana was accidental so far as the appellant was concerned. It is a matter of proximity and degree as to which minds will differ, but it seems to us that the connection of the seller with the steps taken by the buyer after the sale was too remote to save the seller from the tax. Dramatic circumstances, such as a great universal stream of grain from the State of purchase to a market elsewhere, may affect the legal conclusion by showing the manifest certainty of the destination and exhibiting grounds of policy that are absent here."

12 Emphasis added.

The instant case, far more closely resembles the Kalem case than the Superior Oil case. For the petitioner makes its sales to Connecticut Power with no mere "indifferent knowledge" as to what Connecticut Power contemplates. Because of petitioner's former membership in the Exchange, because it has directors and officers interlocking with Connecticut Power and owns a sizable block of Connecticut Power's stock, petitioner cannot possibly lack knowledge of the fact that the sales by it to Connecticut Power are indispensable to those Exchange arrangements which culminate in the transmission to, and sale of, considerable quantities of electric energy in Massachusetts. Indeed, the record shows that petitioner openly admitted that it has such knowledge. Petitioner, therefore, is fully aware that some of such energy is unavoidably destined by the buyer for interstate use. Cf. Louisville & Nashville R. R. Co. v. Parker, supra.

■ The facts here are, then, ample to show such knowledge as is required; but we are not to be taken as saying that less facts would not be sufficient. We have not based our ruling on "affiliation" between the companies, or on the thesis that Connecticut Power is an agent of petitioner. Nor have we considered it of any importance that petitioner, in 1936, sold assets to Connecticut Power and took other steps to escape the Commission's jurisdiction; to make such an attempt is not unlawful, is indeed not immoral—not even if it fails.

■ It is immaterial that the sales are "indirect" in that they are sold within the state to another company for transmission and sale outside the state, or that the quantities of energy sold are variable or small (relative to the seller's total output) or are part of petitioner's "surplus" production;[13] or that the sales are made at petitioner's place of business;[14] or that petitioner sells without prior obligation to do so.[15] Nor is it of significance that the energy, in the course of transmission, passes through Connecticut Power Company's transformers where the voltage is changed; the nature of electric energy and of its transmission is such that we regard as inapposite cases (like Arkadelphia Co. v. St. Louis, S. W. Ry. Co., 249 U.S. 134, 151, 152, 39 S.Ct. 237, 63 L.Ed. 517) where shipments are interrupted for a considerable period during which the goods are processed.[16]

■ We conclude that the Commission correctly held that petitioner is engaged in "the sale of electric energy at wholesale in interstate commerce."

■ 4. Petitioner, however, contends that, even if it is engaged in interstate wholesale sales, still it is not a "public utility," and, therefore, the Commission's orders are invalid. In brief, its position is (a) that a company, although engaged in making such interstate sales, is not a "public utility," subject to the Commission's jurisdiction, unless it has facilities for "transmission in interstate commerce," and (b) that petitioner has no such facilities.

More in detail, its contention is as follows: (1) All facilities of such a company are rigidly divided into those for "transmission" and those for "generation" of electric energy. (2) Petitioner has no facilities for transmission in interstate commerce; accordingly, all its facilities used in connection with its interstate wholesale sales are "generation" facilities. (3) The Commission has no jurisdiction under any section found in Part II, over "generation" facilities. (4) It follows that the Commission has no jurisdiction, under Part II, over any of petitioner's facilities. (5) Therefore, petitioner is not a "public utility," as that term is used in §§ 208 and 301(a) pursuant to which the Commission's orders were entered, since that term, for the purposes of those sections, is defined, in § 201(e), as a company which owns or operates facilities subject to the Commission's jurisdiction under Part II. (6) The result, says petitioner, is that the Commission's orders here under review are invalid.

[13] See Peoples Natural Gas Co. v. Fed. Power Comm., supra; Jersey Central P. & L. Co. v. Fed. Power Comm., supra.

[14] Flanagan v. Federal Coal Co., 267 U.S. 222, 225, 45 S.Ct. 233, 69 L.Ed. 583; Pennsylvania R. R. v. Clark Coal Co., 238 U.S. 456, 465, 35 S.Ct. 896, 59 L.Ed. 1406; Peoples Natural Gas v. Fed. Power Comm., supra.

[15] Western Union Tel. Co. v. Foster, 247 U.S. 105, 113, 38 S.Ct. 438, 62 L. Ed. 1006, 1 A.L.R. 1278.

[16] Cf. Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518; Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Western Union Tel. Co. v. Foster, 247 U.S. 105, 113, 38 S.Ct. 438, 62 L.Ed. 1006, 1 A.L.R. 1278; Mississippi River Fuel Corp. v. Federal Power Commission, 8 Cir., 121 F.2d 159, 164.

The essential points in this contention are the assertions (1) that in no portion of Part II is the Commission given jurisdiction over generation facilities; (2) that all facilities of such a company are either for generation or for transmission, and that petitioner has no interstate transmission facilities, and no facilities used in connection with its interstate wholesale sales except its generation facilities. If the petitioner errs as to either of these two assertions, its entire contention falls. We hold that it does so err, for the following reasons:

Even if we assume that generation facilities are not within the Commission's jurisdiction under § 201(b) or any other portion of Part II, and also that petitioner has no facilities for interstate transmission, still petitioner's contention is untenable: Section 201(b) confers jurisdiction over not only facilities (1) for interstate *transmission* but also—and *disjunctively*—over facilities (2) for interstate wholesale *sales*. If the Commission has no jurisdiction under § 201(b) over generation facilities, then that part of that section conferring jurisdiction over facilities for interstate wholesale sales becomes meaningless—unless there is a third category of facilities, i.e., those used neither for transmission nor for generation. We must, therefore, look for that third category. We find it in petitioner's corporate organization, contracts, accounts, memoranda, papers and other records, in so far as they are utilized in connection with such sales.[17]

It should be noted that the word "facilities" is generally regarded as a widely inclusive term, embracing anything which aids or makes easier the performance of the activities involved in the business of a person or corporation. Cf. Nekoosa-Edwards Paper Co. v. M. St. P. & S. F. Ry. Co., 217 Wis. 426, 259 N.W. 618, 620; Fraters v. Keeling, 20 Cal.App.2d 490, 67 P.2d 118, 119; Funk & Wagnalls Dictionary (1913 Ed.) 888.

■ 5. A majority of the court holds that there is also the following alternative ground for rejecting petitioner's contention: Even if we assume that petitioner has no facilities for interstate transmission, and that petitioner's books, records, etc., are not facilities for wholesale sales in interstate commerce, so that petitioner has nothing except facilities for generation, still petitioner's contention is unsound. For we consider that generation facilities, where used as aids to such sales, are within the Commission's jurisdiction under § 201(b).

As previously noted, that subsection specifically provides that "the Commission shall have jurisdiction over *all* facilities" either for (1) "transmission of electric energy in interstate commerce" or (2) "the sale of electric energy at wholesale in interstate commerce." If that sentence, so providing, stopped there, it would be obvious that the Commission has jurisdiction over generation facilities when used in connection with interstate wholesale sales. The sentence, however, continues with a clause (which, for convenience, we shall call the "but" clause) reading: "but shall not have jurisdiction, except as specifically provided in this Part and the Part next following [sections 824–825r of this title], over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter." This "but" clause, petitioner argues, reduces the authority conferred on the Commission over "all facilities" for "the sale * * * at wholesale in interstate commerce," in the earlier part of the sentence, by excluding "facilities used for the generation." To this argument there are several answers:

(a) In the preceding subsection, 201(a), Congress "declared" that " * * * Federal regulation of matters relating to generation to the extent provided in this Part and the Part next following [sections 824–825r of this title] * * * is necessary in the public interest." The legislative history of the Act also weighs heavily against petitioner's assertion. As that history is excellently summarized in Jersey Central Power & L. Co. v. Federal Power Commission, supra, we shall do no more than to quote the following from the statement of

---

[17] We note, in passing, that such records, etc., are described in § 301(a).

It is suggested that, if such records, etc., are facilities, they are used in the generating business so that, if the generation facilities are excluded, so must they be. But some of the records, etc., are used in connection with the sales and not the generation; that they are partly used in the generation business is not material.

the House Conferees accompanying the Conference Report:[18] "The Senate bill in Section 210(a) contained a somewhat more lengthy declaration of policy than the House Amendment, the only material difference being that the House Amendment contained no reference to 'generation' of electric energy which appeared in the Senate Bill. The conference substitute follows the language of the House Amendment but inserts a clause relating to generation to the extent regulation thereof is provided in this Part and the Part next following. The House Amendment and Conference substitute also makes reference to the 'sale of electric energy at wholesale in interstate commerce' which reference did not appear in the Senate bill. The same general differences between the Senate bill and the House Amendment has been followed with a clarifying phrase added to remove any doubt as to the Commission's jurisdiction over the facilities used for the generation and local distribution of electric energy to the extent provided in other sections of this Part and the Part next following."

Moreover, among the facilities described in the "but" clause of § 201(b), are those used "only for the transmission * * *· in intrastate commerce"; as such facilities could not possibly be among those used for interstate transmission or interstate wholesale sales, the "but" clause becomes foolish if interpreted as carving out of the authority granted in the earlier part of the same sentence the facilities described in the "but" clause. Such a foolish interpretation is avoided by giving effect to a phrase in the "but" clause, i.e., "except as specifically provided in this Part or the Part next following [sections 824–825r of this title]." The "but" clause then shows up not as one reducing jurisdiction but as a negatively worded confirmation of the Commission's jurisdiction, in certain circumstances, over the facilities mentioned in the "but" clause. In other words, the "but" clause is to be construed as if it read: "Wherever it is so specifically provided in Parts II and III, the Commission shall have jurisdiction over the facilities used for generation, for local distribution, for intrastate transmission, etc."

Under that interpretation, the Commission, under § 201(b), has jurisdiction of generation facilities when used in connection with wholesale interstate sales, because jurisdiction of facilities for such sales is "specifically provided" in that section. Congress, we think, intended to exempt generation facilities when not used for interstate purposes because, when not so used, they are intrastate facilities; accordingly, when not so used, they are grouped, in the "but" clause, with other non-interstate facilities, i.e., facilities used in local distribution or for intrastate transmission.

■ Regarding the "but" clause as an exception, and keeping in mind the obvious purpose of Congress, disclosed in the legislative history, to see to it that there was effective regulation of interstate wholesale sales of electrical energy, we consider as pertinent the "elementary rule requiring that exceptions from a general policy which a law embodies should be strictly construed * * *." Spokane & Inland R. R. v. United States, 241 U.S. 344, 348, 350, 36 S.Ct. 668, 671, 60 L.Ed. 1037; cf. Piedmont & Northern Ry. v. I. C. C., 286 U.S. 299, 311, 312, 52 S.Ct. 541, 76 L.Ed. 1115; United States v. McElvain, 272 U.S. 633, 639, 47 S.Ct. 219, 71 L.Ed. 451.

We note that the Natural Gas Act, U. S.C.A.Title 15, § 717(b) provides that that Act shall apply to the "transportation" of natural gas "in interstate commerce" or to the "sale in interstate commerce of natural gas for resale"; the same sentence contains a "but" clause reading: "but *shall not apply* * * * to the local distribution of natural gas or to *the* * * * *production or gathering of natural gas*."[19] Yet, in People's Natural Gas Co. v. Federal Power Commission, supra, a company engaged in production of natural gas, but not in its interstate transportation, was held to be subject to the Act because, in the State of Pennsylvania, it sold gas to another company which transported the gas to another state for resale.

The point is that it is not as such that the generation facilities are subject to the Commission's jurisdiction under § 201(b), but as facilities used in the business of knowingly selling electric energy wholesale in interstate commerce. It is the fact of petitioner's knowledge which should dissipate the apprehension expressed in the brief of amicus curiae that the result of a decision sustaining the Commission in

---

[18] 74th Cong., 1st Sess.. House Report No. 1903, page 74.

[19] Emphasis added.

this case "will be to bring under the Commission's jurisdiction every generating company which generates any electric energy which *finds its way* into interstate commerce." We are not holding, nor did the Commission hold, that the Act has "the effect of bringing all owners of generating facilities" with that jurisdiction.[20]

5a. The Commission argues that there is an additional ground for holding that it has "jurisdiction" under § 201(b). Since we have held that it has "jurisdiction," for the reasons heretofore given, we shall not consider that argument but merely note that it runs as follows: In Utah Power & L. Co. v. Pfost, 286 U.S. 165, 181, 52 S.Ct. 548, 552, 76 L.Ed. 1038, the court differentiated between generation and transmission, stating that transmission "begins * * * definitely at the generator, at which point measuring appliances can be placed and the quantum of electrical energy ascertained with practical accuracy." As appears from our summary of the facts in the instant case, petitioner owns and operates facilities connecting its generators with the "bus," and circuits connected with that "bus" which lead, through bushings in the wall of petitioner's generating plant, to the substation owned by Connecticut Power Company; all those connections, the bus, and that part of the circuits inside the petitioner's generating plant, are owned by petitioner. The Commission argues that those facilities, under the Pfost case, are transmission facilities and, as the energy sold in Massachusetts passes (with petitioner's knowledge) through those facilities, they are "facilities * * * for the transmission of electric energy in intrastate commerce," and are within the Commission's jurisdiction under § 201(b). Petitioner argues that such facilities are classified in the Commission's accounting rules as part of a generating plant; but the Commission replies that such an accounting classification cannot be controlling when the question, as here, is one of jurisdiction. Petitioner also argues that these facilities, even if for transmission, are, relatively, so small in extent that they cannot be the basis of jurisdiction; the Commission answers that in Jersey Central Power & L. Co. v. Federal Power Commission, 3 Cir., 129 F.2d 183, jurisdiction, under § 201(b), was held to be properly based on

---

[20] Because of the wording of the statute, it would seem to make little practical difference (1) whether we decide that the Commission has "jurisdiction" over petitioner's corporate organization, records, etc., so far as they are used in connection with interstate wholesale sales—leaving undecided the question whether it also has "jurisdiction" over petitioner's generation facilities because they are used in connection with such sales—or (2) whether we go further and decide (either independently or in the alternative) that it has "jurisdiction" over such generation facilities because they are so used. This is true because, once it is decided that the Commission has "jurisdiction" over any of petitioner's facilities, then the petitioner is a "public utility," and the Commission is then vested with specific powers under the several sections of the Act which refer to a "public utility;" and some of those sections give the Commission specific powers—some direct and some indirect—with respect to the generating facilities of a "public utility."

Thus § 207 relates to "any public utility." It provides that, on complaint of a State Commission, if the federal Commission finds "any interstate service" of "any public utility" inadequate, it may "compel the enlargement" of the "generating facilities," unless to do so will impair the public utility's ability to render adequate service to its customers; and see section 202.

Also, since petitioner is a "public utility," the Commission, even if it had "jurisdiction" solely over petitioner's corporate organization, records, etc., would have authority to regulate petitioner's rates for interstate sales (§ 205); to investigate the cost of any of its properties, especially so far as that is necessary for rate-making (§ 208); to order petitioner to keep its records, etc., as the Commission prescribes (§ 301); to fix rates of depreciation of petitioner's "several classes of property" (§ 302); and require petitioner to file reports, including data as to earnings, etc., and costs of "generation" (§ 304).

It is true that were we to leave it undecided whether the Commission has any "jurisdiction" over petitioner's generating facilities, we would thereby leave it undecided whether, as to such facilities, the Commission has authority, with respect to petitioner's generating facilities, under § 203, requiring the Commission's approval of the sale, etc., of a whole or part of a public utility's facilities "subject to the jurisdiction of the Commission." And the same might be true with respect to § 206(b); cf. however, the Commission's powers over petitioner under §§ 205 and 213.

a transmission line which was but seven-eighths of a mile in length.

6. Petitioner, however, argues that, regardless of all other consideration, Congress cannot have intended that the Commission should have jurisdiction over any of petitioner's facilities because of the preamble of the Act, § 201 (a) which reads as follows: "It is hereby declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this Part and the Part next following [sections 824–825r of this title] and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States."

On the basis of the closing words of that section, two arguments are advanced. The first (as we understand it) runs thus: The Connecticut Commission asserts that it, absent a federal statute, has complete jurisdiction over all petitioner's facilities and activities; and perhaps, if the question were to arise today, the Supreme Court would hold that, absent federal legislation, such a State Commission can constitutionally exert such jurisdiction; accordingly, the last phrase in § 201 (a) should be read as depriving the Federal Commission of jurisdiction.

■■ With that suggestion, we cannot agree. For, in ascertaining the legislative purpose, we must read the legislation in the light of the views of Congress at the time of its enactment.[21] Whatever may be the doctrine today (a matter we need not consider), it is clear, from the legislative history, that, when this Act was in Congress, wholesale interstate sales were, even in the absence of Federal legislation, deemed to be beyond State regu-latory powers, under Public Utilities Commission v. Attleboro, 273 U.S. 83. Yet petitioner would have us adopt an interpretation of the Act which would deprive the Federal Commission of jurisdiction over the very kind of sale which, under the Attleboro case, would then have been held not to be subject to state regulation, although one of the chief purposes of the Act was to close just that regulatory gap.[22]

Petitioner also seems to argue that, because of the closing words of § 201 (a), the Federal Commission is denied jurisdiction over any facilities which are, in part, subject to regulation by any State, and that, since the State of Connecticut, through a State Commission, regulates, in part, all petitioner's facilities, Congress must be understood as intending that they should not be within the regulatory power of the Federal Commission. That suggestion is without merit. And especially so with reference to accounts, records and the like. For Congress obviously contemplated that there would, in many cases, be both federal and state regulation. Thus, in § 301 (a), after conferring on the Federal Commission authority over such matters, Congress said, "Provided, however, That nothing in this Act [chapter] shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State." Thus a company like petitioner may be required to keep its accounts, etc., in two distinct forms, one pursuant to the orders of the Federal Commission and the other in accord with State requirements.[23]

Section 209 (b) unmistakably recognizes the likelihood of duality in regulation, and is designed to mitigate its effects, by providing for "conferences" and "joint hearings" by the Federal and State Commissions "regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the [federal] Commission."[24]

---

21 Cf. Great Northern Ry. Co. v. United States, 315 U.S. 262, 273, 62 S.Ct. 529, 86 L.Ed. 836; United States v. Union Pacific R. Co., 91 U.S. 72, 79, 23 L.Ed. 224; Ingo v. Koch, 2 Cir., 127 F. 2d 667, 678, and note 21.

22 Cf. Peoples Natural Gas Co. v. Federal Power Commission, App.D.C., 127 F.2d 153, 159.

23 Cf. Northern States Power v. Federal Power Commission, 7 Cir., 118 F.2d 141, 144; Alabama Power Co. v. Federal Power Commission, App.D.C., 128 F.2d 280, 285; Louisville Gas & Electric Co. v. Federal Power Commission, 6 Cir., 129 F.2d 126, 132.

24 We have already noted that the preamble explicitly contemplates "Federal

Other sections of the Act are also pertinent. For instance, petitioner's suggested interpretation of the last words of § 201 (a) would render § 204 partly superfluous and partly inoperative. For Section 204 (a) provides that no public utility shall issue securities without the authorization of the federal commission, while § 204 (f) exempts from this requirement a utility which is both "organized and operating" in a State under whose laws its security issues are regulated by a State Commission. The suggested interpretation of 201 (a) would make § 204 (f) unnecessary; and it would nullify § 204 (b) which gives the federal Commission jurisdiction over the security issues of a utility "organized" but not also "operating" in a State whose Commission is empowered by State law to regulate such securities.[25]

We cannot agree that Congress intended by the preamble that interstate transactions, which the Attleboro case had held to be beyond the regulatory power of the States, should be exempt from federal regulation where they are carried on by facilities which are also used for intrastate commerce.

Moreover, petitioner's suggested interpretation gives undue weight to a preamble clause worded as generally as § 201 (a). Cf. Carter v. Carter Coal Co., 298 U.S. 238, 280, 56 S.Ct. 855, 80 L.Ed. 1160; N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 129, 130, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.[26]

For that reason, we also reject the following suggestion: Although, as already noted, § 201 (b), disjunctively, confers jurisdiction over interstate transmission or interstate wholesale sales, yet, it is said, this disjunction must be disregarded because the preamble refers, conjunctively, to "the business of transmitting and selling electric energy"; this reference, it is urged, restricts the application of §

201 (b) to a "person" which is in the joint business of transmitting and selling in interstate commerce. It will be noted that the result would be to exempt a corporation engaged in transmitting, but not selling at wholesale, in interstate commerce, a result which the legislative history shows to be in flat contradiction of the legislative purpose, for it would relieve such a company from both State and Federal regulation. The preamble of the Natural Gas Act, U.S.C.A. Title 15, § 717 (a), speaks in similar conjunctive manner of the "business of transporting and selling natural gas," while § 717 (b)—like 201 (b) of the Federal Power Act—makes the Gas Act applicable, disjunctively, to "such transportation or sale." In the People's Natural Gas case, supra, the court gave effect to the disjunctive treatment in § 717 (b), paying no attention to the conjunctive description in the preamble.

7. We are not unmindful of the doctrine of such cases as Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 61 S.Ct. 580, 582, 85 L.Ed. 881; Palmer v. Massachusetts, 308 U.S. 79, 83, 84, 60 S.Ct. 34, 84 L.Ed. 93, and A. A. Kirschbaum v. Walling, Administrator, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. ——, i.e., that, having "due regard for a proper adjustment of the local and national interests in our federal scheme," [312 U.S. 349, 351], 61 S. Ct. 580, 582, 85 L.Ed. 881, the courts should discountenance "in roads by implication on state authority," [308 U.S. 79, 84, 60 S.Ct. 37, 84 L.Ed. 93], and that a Congressional intent to extend federal regulation should not be assumed to exist unless Congress is "reasonably explicit" in stating such a purpose. We think the Congressional purpose to vest the Commission with the powers it here asserts does not rest upon mere implication and that the Act and its legislative history make that purpose, to say the least, "reasonably explicit." There is no

---

regulation of matters relating to generation to the extent provided in" Parts II and III, and that the Conferees stated that the references to "facilities for generation and local distribution" were "added to remove any doubts as to the Commission's jurisdiction" over such matters where thus specifically provided.

[25] Other provisions which may result in duality of regulation are noted in the opinion in the Jersey Central case, 3 Cir., 129 F.2d 183, 189, note 2.

[26] § 201(a) is to be contrasted with the very different preamble to the Public

Utility Holding Company Act of 1935, § 1(c), 15 U.S.C.A. § 79a(c), which was enacted on the same day and as another Title of the same legislation as the amended Federal Power Act.

See also the very different use of a "declaration of policy" in the Agricultural Adjustment Act of 1933, where many sections of the statute, following the preamble and conferring authority upon the Secretary, contain the words "in order to effectuate the declared policy"; see, e. g., U.S.C.A. Title 7, §§ 608b, 608c (16) (A).

basis for the fear expressed in the brief of amicus curiae that a decision sustaining the Commission's orders will involve grave encroachments "upon the jurisdiction of state regulatory authorities."

8. The facts and the meaning of the statute are sufficiently clear so that, in arriving at our decision, we have not deemed it necessary to consider whether the doctrine of Gray v. Powell, 314 U.S. 402, 413, 62 S.Ct. 326, 86 L.Ed. 301,[27] is applicable here, i.e., that the "experienced judgment" of the Commission, in its interpretation of the statute as applied to the facts, must be given great weight.

9. We have discovered no evidence in the record which shows that the findings of fact made by the Commission, necessary to support its orders, are not based on substantial evidence. We cannot, therefore, agree with petitioner that the Commission was under a duty to make further findings of uncontested facts, as requested by petitioner, which, to quote petitioner's brief, related to "legal criteria rejected"—and we hold correctly rejected—"by the Commission." Such a duty no more rests upon the Commission than it does upon a federal trial judge, sitting without a jury, who is also required to make findings.

10. Petitioner assigns as error the failure of the Commission to include in the record before us any trial examiner's report. No such report was ever served on petitioner and petitioner based no arguments on the contents of such a report either here or before the Commission. So far as appears from its findings and legal conclusions, the Commission did not rely upon any such report, nor is it required to do so by the Act. We see no reason why, in the circumstances, that report, if there be one, should be considered by us. Cf. N. L. R. B. v. Air Associates, 2 Cir., 121 F.2d 586; Kidder Oil Co. v. Federal Trade Commission, 7 Cir., 117 F.2d 892, 902, is not in point;[28] and we are not prepared to say that we would follow it even if the facts were identical.

The petition is denied and the orders of the Commission are affirmed.

L. HAND, Circuit Judge (concurring).

I agree that there may be "facilities" for selling electric energy which are neither the apparatus which generates it, nor the wires which carry it to where it is used. What such selling "facilities" include it would be hard to say; but they must at least go so far as to comprise the selling organization with its paraphernalia of records and the like, and that is enough to dispose of this appeal. This reading is consonant with the purpose expressed in § 201 (a); and the use of the disjunctive in § 201 (b)—"for such transmission or sale"—to my mind turns the scale. As it is not necessary to go any further, I prefer to rest my concurrence upon this ground alone, leaving undecided whether the Commission has any jurisdiction over the "facilities for * * * generation" as such because they too are "facilities for sale."

---

[27] Cf. Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586; Morgan Stanley, Inc., v. S. E. C., 2 Cir., 126 F.2d 325; Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208.

[28] There a report of the trial examiner had been served on the company which had filed exceptions thereto and submitted a brief and oral argument to the Commission in support of such exceptions; the court held that it had discretion to require, in such circumstances, that the report be made part of the record.