## TRENTON POTTERIES CO. et al. v. UNITED STATES.*

(Circuit Court of Appeals, Second Circuit. May 9, 1924.)

No. 219.

1. **Criminal law ⬤➡112(3)—Venue; conspiracy in restraint of trade.**

Where an indictment for conspiracy in restraint of interstate commerce, in violation of Sherman Anti-Trust Act, § 1 (Comp. St. § 8820), was found in a district in which it is not alleged that the conspiracy was formed, and in which none of the defendants reside, the commission of some act in furtherance of the conspiracy in that district is essential to the jurisdiction of the court, and the giving of an instruction that it is immaterial whether or not any effort was made to carry the conspiracy into effect was material error.

2. **Monopolies ⬤➡12(1)—"Restraint of trade," in violation of Sherman Act, must be such as to work injury to the public.**

To constitute "restraint of trade," within the meaning of Sherman Anti-Trust Act (Comp. St. § 8820 et seq.), whether the question is raised in a suit in equity for an injunction, in an action at law for damages, or in a criminal prosecution under the act, the restraint must be undue and unreasonable, such as to work injury to the public.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraint of Trade.]

3. **Witnesses ⬤➡268(1)—Allowing question to witness on cross-examination held error.**

In a prosecution for conspiracy, permitting an indirect attack on defendants by allowing an official of the association formed by them to be asked on cross-examination if a person with whom the association had dealings had not been called before a local investigating committee *held* error.

4. **Witnesses ⬤➡345(1)—Allowing question as to violation of law by corporation on cross-examination of employee held error.**

In a criminal prosecution, permitting an employee of a defendant corporation to be asked on cross-examination, for the avowed purpose of impeachment, if his employer had not pleaded guilty to a violation of the law, *held* error.

5. **Criminal law ⬤➡448(2)—Statement of witness as to "competition" between dealers not inadmissible as a conclusion.**

In a prosecution under the Sherman Act for conspiracy in restraint of trade, testimony of a purchaser as to whether or not he found "competition" among defendants was not inadmissible as a conclusion of the witness.

---

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against the Trenton Potteries Company and others. Judgment of conviction, and defendants bring error. Reversed.

Indictment was under section 1 of the Sherman Act (26 Stat. 209 [Comp. St. § 8820]), and in two counts. The first count alleges in substance that numerous corporations and individuals, for the space of three years prior to the July term of 1922, unlawfully engaged with each other in a combination and conspiracy in restraint of interstate trade and commerce in sanitary pottery; all of the defendants being either manufacturers of or officers of corporations engaged in manufacturing pottery of that description. This count alleges that defendants, in pursuance of a common plan, fixed and exacted noncompetitive prices for the sale of said pottery in and among the several states, and "to, into, and through the Southern district of New York": further, they refrained from engaging in competition with each other as to the prices of said pottery, and within the period first above stated extended and carried out their conspiracy and combination "within the Southern district of New York."

The second count alleges that within and during the same period the defendants engaged in combination and conspiracy in restraint of interstate trade and commerce, and by virtue of and in pursuance thereof, and by common and concerted action, within the Southern district of New York and elsewhere, "limited and confined their sales of sanitary pottery to a special group selected by said defendants by agreement, and known and denominated by them as legitimate jobbers"; further, in pursuance of this combination and conspiracy they refused to make contracts for the sale and delivery of such pottery to persons in the Southern district of New York except to "such so-called legitimate jobbers."

Such of the numerous defendants as were found guilty under this indictment brought this writ of error.

H. Snowden Marshall, of New York City, and Richard V. Lindabury, of Newark, N. J. (Edward L. Katzenbach, of Trenton, N. J., Max D. Steuer, of New York City, George H. Calvert, of Washington, D. C., and John W. Bishop, Jr., of Newark, N. J., on the brief), for plaintiffs in error.

David L. Podell, Sp. Asst. U. S. Atty., of New York City (William Hayward, U. S. Atty., and Leland B. Duer, Nathan Probst, Jr., and Susan Brandeis, Sp. Asst. U. S. Attys., all of New York City, on the brief), for the United States.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). It is not necessary to review the facts at large; sufficient to note that the subject-matter of prosecution is a trade agreement to maintain a central bureau of information, disseminate knowledge of prices, customers, discounts, etc., obtained thereby, and thus persuade or induce the large number of sanitary pottery manufacturers who belonged to the association to conduct their businesses in a reasonably uniform manner as to prices and discounts and protect the jobbers who constituted their largest normal "outlet." While differing in detail, the schemes condemned in Eastern, etc., Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, and American Column, etc., Co. v. United States, 257 U. S. 377, 42 Sup.

Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093, may with sufficient accuracy be said to suggest the sort of combination alleged by the government to have been formed by these defendants.

The more material points for our consideration grow out of two facts: (1) That the indictment was found in the Southern district of New York, and contains numerous allegations of acts done within that district; and (2) that defendants are said to have been engaged in a conspiracy in restraint of interstate trade and commerce.

[1] The question growing out of the first fact is this: Did the trial court err in instructing the jury in substance (though in several forms and at various times) that, if they found that the defendants did conspire to restrain trade, as charged in the indictment, then it was immaterial whether such agreements were ever actually carried out, whether the purpose of the conspiracy was accomplished in whole or in part, and whether (finally) "any effort was made to carry" the object of the conspiracy into effect.

That as a general proposition of law under the Sherman Act this instruction was correct is a commonplace. Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232. This is because, as the case cited puts it, conspiracy under the Sherman Act is punished on a common-law footing, and no overt act is necessary for conviction, because the offense is complete with the formation of the illegal meeting of minds; but we are persuaded that both the prosecution and the learned court overlooked the peculiarities of this case. None of the parties proceeded against lived within the Southern District; the indictment does not charge that any conspiracy was formed in that district; consequently there was no jurisdiction there to bring the indictment or there to try the case, unless it was shown that jurisdiction was conferred by the commission of an overt act within the Southern district. Easterday v. McCarthy, 256 Fed. 651, 168 C. C. A. 45.

The pleader understood this, for otherwise all the allegations concerning acts done in the Southern district in pursuance of the object of the conspiracy were mere surplusage. Why the United States was so anxious to institute and prosecute this case in the city of New York we do not know, but the frame of indictment compared with the undisputed facts show that New York was intentionally selected, and trial of these defendants in the Third circuit, where most of them resided, was sedulously avoided. Such a choice as this carried with it the burden of proving something done in the Southern district—i. e., an overt act—justifying the finding of an indictment therein. The peculiarity of this transplanted litigation was overlooked below, and it was error, and very material error, to instruct a New York jury in so many words that it was immaterial whether any effort had ever been made to carry out the conspiracy complained of.

[2] The second of the above facts raises the main point in the case, a matter urged throughout the trial and most frankly met by the presiding judge. Defendants insisted in various forms that, inasmuch as they were indicted under the Sherman Act, they could not be convicted thereunder, unless what they had done amounted to an unreasonable or undue restraint of trade in interstate commerce.

Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663. But the court ruled "that the ideas suggested by the Supreme Court in the Standard Oil and Tobacco Cases * * * applied to actions of that character [i. e., the character of the Oil and Tobacco Cases], which were bills in equity," and he held that said ideas "have [no application] here unless we are to construe this [Sherman] act in a way that would render it as obnoxious to the Constitution and as incapable of enforcement" as the so-called Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛e et seq.), considered in United States v. Cohen, etc., Co., 255 U. S. 81, 41 Sup. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045. The matter was finally presented by the following request to charge:

"The essence of the law is injury to the public; it is not every restraint of competition and not every restraint of trade that works an injury to the public; it is only an undue and unreasonable restraint of trade that has such an effect and is deemed to be unlawful."

Which request was refused in toto. In this we think that the learned court erred, and in a manner that went to the foundation of the prosecution. Whether the government brings suit in equity to obtain injunctive relief, or a private person sues at law for triple damages, or a grand jury finds an indictment for conspiracy, such proceedings and all of them, if brought under the Sherman Act, must necessarily charge and prove a violation of that statute. The statute cannot mean one thing on the criminal side of the court and another on the civil side.

In the well-known cases relied on by defendants, the court was not defining a civil injury; it was defining the phrase "in restraint of trade." That is a very old phrase of the law; it became a term of art generations before the Sherman Act was enacted, and the cases cited are full authority for the proposition that, when that phrase was used by the Congress in this statute, it meant the same kind of restraint of trade that the law had known for generations, to wit, undue and unreasonable restraint; and when the highest court assigned this meaning to the phrase, that meaning applies, however and wherever the statute is invoked.

The point is not without authority, if any were needed. In Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232, a demurrer was lodged to an indictment under the Sherman Law on the ground "that the statute was so vague as to be inoperative on its criminal side" (page 376 [33 Sup. Ct. 781]), and this objection to the "criminal operation of the statute" was thought to be warranted by the Standard Oil and Tobacco Cases, supra. But Holmes, J., for the court, speaking in a criminal case, declared that the cases last referred to "may be taken to have established that only such contracts and combinations are within the act as by reason of intent or the inherent nature of the contemplated acts prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade." This is a direct holding binding upon this court, to the

effect that the construction of the statute, or the accepted definition of its essential phrase, applies on the criminal side as well as on the civil.

Further in the Cohen Co. Case, supra, the Nash decision was cited with approval, and the Chief Justice pointed out (page 92 [41 Sup. Ct. 301]) that, while the Lever Act there under consideration afforded no sufficient guide to the jury in their deliberations, because it set up no "ascertainable standard of guilt," yet in the instances of which the Nash Case is one it had been found and held, "either from the text of the statutes involved or the subjects with which they dealt, that a standard of some sort was afforded." In other words, there is no more difficulty in asking a jury to decide whether a given set of facts constitutes an unreasonable or undue restraint of trade, than there is in asking the same jury to answer the question stripped of its adjectives.[1]

We note some minor points, as there may be a new trial. In the examination of witnesses there is great room for discretion on the part of both court and counsel. That of counsel is often and naturally clouded by a desire somehow or anyhow to advance his own case. It is the duty of the court to exercise its own discretion in keeping counsel within what ought to be the very plastic rules of evidence. There is no flat regulation of injurious immateriality or hearsay, and it would be a misfortune if there were one; yet both court and counsel must always run the risk of making a mistake in the degree of latitude exercised. We think mistake was made and error committed in some instances.

[3] (1) The secretary of the Potters' Association was on the stand, and some mention had been made of one Hanley, who was an official of the Jobbers' Association, whereupon the prosecution asked the witness whether "at or about that time you knew the Lockwood Committee was in session, and that this Mr. Hanley had been summoned as a witness and was being examined before that committee." Over objection the witness answered that he did know from the newspapers that Hanley had been "under fire" before said committee. Ordinarily this would be one of those incidents of trial sure to happen in the heat of examination, and of no importance at all. But the context shows that this mention of the Lockwood Committee was of design, the imputation or suggestion being that any one who was under fire by that organization (a local investigating body that had attracted considerable attention in the building trades) was smirched by being attacked. This is a favorite, and very modern, form of verbal assault, but it had no place in a criminal trial. We mention it, because it is an illustration of how the same latitude of language or suggestion may be of no importance in one cause and of serious moment in another. In this case, in its essence an inquiry into statutory trade regulations, the suggestion that the man with whom the witness had had dealings was an unreliable person (to put it mildly), because he had

---

[1] That the so-called "rule of reason" was foreseen, is interestingly shown in the late Albert H. Walker's "History of the Sherman Law" (see page 57), a book published before final decision in the Oil and Tobacco Cases.

been called as a witness before the Lockwood Committee, was inadmissible and prejudicially erroneous.

[4] (2) The same theory of action was carried further in the examination of one Bantje, an employee of the J. L. Mott Company (not a defendant), who was asked over objection this question: "You know that your concern pleaded guilty to a violation of this very law in this very court?" The theory, frankly stated, on which the question was allowed, was that the matter affected the credibility of the witness; and this reason was given after the witness had declared that he personally did not know anything at all about it. We are not aware of any other ruling heretofore made which in effect impugns the veracity of a whole body of employees, because the corporate employer had previously pleaded guilty to an infringement of the Sherman Law.

[5] (3) The other point to be noted is the treatment of testimony offered in respect of competition averred by defendants as existing between themselves during the period covered by indictment. Under the first count it was essential for the prosecution to prove the absence of competition; i. e., the exaction (in the language of the count) of "noncompetitive prices." As is customary in conspiracy causes, one, if not the main, object of the prosecution was to show the absence of effective competition, and ask the jury to infer therefrom an agreement to bring about the proven course of business. It was, of course, incumbent upon the defense to show, if possible, the presence of actual competition in respect of prices. It seems to us that competition, even when limited to competition in price, is a word or phrase of very plain and simple meaning. It is not one that calls for expert knowledge or labored definition; yet, for example, a purchaser of the kind of goods manufactured by defendants was asked, "Did you find any competition for your trade among these people?" and he was not permitted to answer, on the ground that "competition is a conclusion which results from a certain course of dealing; that is for the jury to find out." This is but illustrative of a long line of rulings. We think it clear that, when a man is asked whether he had competition, encountered competition, entered competition, or observed competition, any trader, indeed, any man acquainted with the English language, knows what is meant, and such questions do not in the legal sense ask for "conclusions." Words, like coins, are more or less current, and so men are more or less acquainted with their significance; it is rather late in the history of Sherman Law litigation to treat the word "competition" as even connoting or suggesting anything not known of all men.

We have not expressed opinion on all the matters argued, but have now given reasons for the result to be announced, so far as they will aid in trying this cause anew.

Judgment reversed.