490

## J. B. LIPPINCOTT CO. v. FEDERAL TRADE COMMISSION.

### No. 7927.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 17, 1942.

Decided June 30, 1943.

Benjamin O. Frick, of Philadelphia, Pa., for petitioner.

Joseph J. Smith, Jr., of Washington, D. C. (W. T. Kelley, Chief Counsel, Federal Trade Commission, and J. B. Truly, Fletcher G. Cohn and James W. Nichol, Sp. Attys., all of Washington, D. C., on the brief), for respondent.

Before BIGGS, MARIS, and JONES, Circuit Judges.

JONES, Circuit Judge.

This is a petition to review a cease and desist order entered by the Federal Trade Commission in a proceeding under Sec. 5 (b) of the Federal Trade Commission Act, as amended, 15 U.S.C.A. § 45(b). In addition to the J. B. Lippincott Company, the present petitioner, the order also runs against Chicago Medical Book Company, W. B. Saunders Company, C. V. Mosby Company and Van Antwerp Lea and Christian Febiger, partners trading and doing business as Lea & Febiger.

The Chicago Medical Book Company, of Chicago, Illinois, is a distributor of medical books, while the Saunders Company, the Mosby Company and Lea & Febiger are publishers of medical books exclusively and sell only their respective publications. The Lippincott Company, whose principal office and place of business is in Philadelphia, also publishes some medical books but the principal part of its business is the publication and sale of books other than medical. Lippincott, too, sells only books of its own publication. The offenses charged by the complaint do not involve the sale of books other than medical.

The complaint alleges that the Chicago Medical Book Company and the publishers above named, including the Lippincott Company, agreed and conspired among themselves not to sell medical books to the Wilcox & Follett Company, a book distributor of Chicago, and that, in pursuance of such agreement and understanding, they refused so to sell to Wilcox & Follett. The complaint also charges a like agreement and conspiracy between the Chicago Medical Book Company, the Lippincott Company and the Mosby Company with respect to

Login Brothers, another book distributor of Chicago.

The Lippincott Company filed a separate answer denying its participation in any agreement or conspiracy not to sell medical books either to Wilcox & Follett or to Login Brothers and further denying that it ever refused to sell books to either of the concerns named. Each of the other respondents to the Commission's complaint filed a separate answer denying the material allegations of the complaint, but, with that, we need not be concerned as the Lippincott Company alone has petitioned for a review of the Commission's order.

After hearing, the Commission found an unlawful agreement or conspiracy among the respondents not to sell medical books and a refusal thereafter to sell, substantially as charged by the complaint. The order now complained of was thereupon entered. The order directs all the respondents named in the complaint to cease and desist, in connection with the sale of medical books, or any other scientific, educational or other books, from "Entering into or carrying out any agreement, understanding, arrangement, combination or conspiracy, among themselves or between and among any two or more of them or between any one or more of them and any competitor, for the purpose or with the effect of restraining, restricting, hindering, obstructing or eliminating competition in the sale of any such book or books, and * * * from doing any of the * * * acts or things" more particularly set forth in the order.

It is the contention of the Lippincott Company (1) that so far as it is concerned, the findings whereon the Commission's cease and desist order is based are not supported by evidence and (2) that the order exceeds the scope and allegations of the complaint.

■ The right to court review of a Commission order exists by virtue of Sec. 5(c) of the Federal Trade Commission Act, 15 U.S.C.A. § 45(c), which also provides that "The findings of the Commission as to the facts, if supported by evidence, shall be conclusive." This provision has been treated as requiring substantial evidence as the basis for findings in order to render them conclusive. See Kidder Oil Co. v. Federal Trade Commission, 7 Cir., 117 F.2d 892, 895. The same view was taken with respect to the requirement, "if supported by testimony", as the particular provision originally read in the Federal Trade Com-

mission Act, 38 Stat. 719, 720, c. 311, Sec. 5, before amendment. See Federal Trade Commission v. Curtis Publishing Company, 260 U.S. 568, 580, 43 S.Ct. 210, 67 L.Ed. 408. In Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126, where a similar provision of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., with respect to the findings of the Labor Board was under consideration, the Supreme Court said that the requirement of evidence as support for findings means substantial evidence. Compare also National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 59 S.Ct. 501, 83 L.Ed. 660, where the necessity for substantial evidence was spoken of as being applicable in general to findings by administrative bodies. We entertain no doubt that the provision of the Federal Trade Commission Act as to the conclusiveness of the Commission's findings requires that the findings be supported by substantial evidence.

■ In the Columbian Enameling & Stamping Co. case, supra, at pages 299, 300, of 306 U.S., at page 505 of 59 S.Ct., 83 L.Ed. 660, it was said that " * * * evidence which is substantial * * * [affords] a substantial basis of fact from which the fact in issue can be reasonably inferred. [Citing cases.] Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' Consolidated Edison Co. v. National Labor Relations Board, supra [305 U.S. page 229, 59 S.Ct. 206, 83 L.Ed. 126], and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury" (citing cases). We have then to consider whether the Commission's findings in the instant case, so far as they relate to the Lippincott Company, are supported by substantial evidence as thus defined.

Although the order has become final as to all respondents named in the complaint, save for the present petitioner, and a large portion of the evidence taken by the Commission relates to others than the Lippincott Company, it is necessary to our present inquiry that we also review the evidence relating to the other respondents, as it is

upon that background and certain additional facts pertaining to the Lippincott Company that the Commission bases its conclusion of fact that the Lippincott Company acted in concert with some or all of the other respondents to the end that Wilcox & Follett were refused the right to purchase medical books published by Lippincott and the other impleaded publishers.

Basic to the Commission's ultimate conclusion against Lippincott is its primary finding that in May, 1936, a representative of the Saunders Company met in Kansas City, Missouri, with the president of the Chicago Medical Book Company, a representative of the Mosby Company, a representative of Lea & Febiger, and representatives of three other dealers in medical books, not made parties to the proceeding, and that as a result of that meeting an agreement or understanding was arrived at not to sell medical books to Wilcox & Follett, the means for effecting such agreement having been left to the president of the Chicago Medical Book Company. The Commission did not find, however, that anyone from the Lippincott Company was present at the meeting in Kansas City or that it was otherwise represented thereat. Nor is there any evidence that what transpired at the Kansas City meeting was ever brought to the knowledge of the Lippincott Company. In fact, the Commission now concedes (its brief, p. 25) that "It is true, as petitioner [Lippincott Company] states (brief, p. 6), that petitioner had no representative at the Kansas City meeting and that no express agreement not to sell Wilcox & Follett Company at customary dealers' discounts was proved as to petitioner."

We do not cite the above concession by the Commission with any thought of suggesting that an express agreement to engage in concerted action for the accomplishment of the alleged unlawful object is requisite to the conspiracy charged.[1] However, in as much as submission by the Lippincott Company to the purpose and requirements of the alleged wrongful undertaking (express as to all others) is made to depend entirely upon inference, the absence of any proof of express assent by Lippincott to the agreement is not without its appropriate bearing when we come to consider whether the conduct of the Lippincott Company, to which the Commission necessarily attaches controlling significance, is sufficient in law to warrant an inference that, consequent upon the agreement and in furtherance thereof, Lippincott refused to sell books to Wilcox & Follett. The fact is that the Commission made no specific finding of any deliberate refusal by Lippincott to sell medical books to Wilcox & Follett but contented itself with a general conclusion embrasive of that essential element by implication. The facts from which the Commission drew its ultimate conclusion are as follows:

On September 19, 1936, the Chicago Medical Book Company, in evident furtherance of the subject-matter discussed at the Kansas City meeting in May preceding, wrote to a number of publishers, including each of those named in the complaint (except for the W. B. Saunders Company[2]), and five other publishers of medical books. Viewed in a light most favorable to the Commission's findings, the letter set forth that the Chicago Medical Book Company did not intend to do any further business with Wilcox & Follett who had been so notified; it assigned as a reason for such action Wilcox & Follett's willful continued wholesale price-cutting to the demoralization of the retail medical book business in the Chicago district; and it concluded with the statement that "We are writing you thus so that you will understand any applications for books direct to you from Wilcox & Follett Company." The Commission construes the latter suggestion, and

[1] See United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L. Ed. 1461; Interstate Circuit v. United States, 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; Federal Trade Commission v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 62, 47 S.Ct. 255, 71 L.Ed. 534; Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L. Ed. 1490, L.R.A.1915A, 788; Baush Machine Tool Co. v. Aluminum Co. of America, 2 Cir., 72 F.2d 236, 241, certiorari denied 293 U.S. 589, 55 S.Ct. 104, 79 L. Ed. 683; Southern Hardware Jobbers' Ass'n v. Federal Trade Commission, 5 Cir., 290 F. 773, 779, 780; Wholesale Grocers' Ass'n v. Federal Trade Commission, 5 Cir., 277 F. 657, 662, 663.

[2] The Chicago Medical Book Company had broad authority in respect of the sale of books published by the W. B. Saunders Company.

we think not unreasonably, as an exhortation by the Chicago Medical Book Company to the recipients of the letter not to sell books to Wilcox & Follett direct. In its answer to the complaint, the Lippincott Company admits its receipt of the Chicago Medical Book Company's letter of September 19 which Lippincott neither acknowledged nor otherwise replied to.

Following receipt of the Chicago Medical Book Company's letter, the Lippincott Company on September 29, 1936, referred for fulfillment by the Chicago Medical Book Company an order from Wilcox & Follett for medical books, and again on October 7, 1936, did likewise with respect to an order from Wilcox & Follett for one medical book. However, it also indisputably appears from the evidence produced by the Commission that on September 25, 1936, the Lippincott Company filled and billed direct to Wilcox & Follett an order for medical books, another like order on October 7, 1936, and two similar orders on October 12, 1936. The Commission's evidence further discloses that for a number of years prior to September, 1936, and thereafter the Lippincott Company had on consignment with the Chicago Medical Book Company certain books published by the Lippincott Company, whose practice it was with respect to orders originating in the Chicago district either to refer such orders to the Chicago Medical Book Company for fulfillment from the books there on consignment or to fill them direct from Lippincott's place of business in Philadelphia, as it chose. Neither the Chicago Medical Book Company nor Wilcox & Follett informed Lippincott that the two orders referred on September 29 and October 7 had not been filled until, as the Commission's witness Follett testified, after "a very short intervening space"—"probably less than two months" he "wrote to * * * [his] friend, Mr. Joe Lippincott" who was "President of the Lippincott Company". Thereupon the two unfilled referred orders were filled direct to Wilcox & Follett by the Lippincott Company. Follett also testified in the same connection that at that time Lippincott "* * * invited us to come back and buy all the medical books we could possibly use, direct from J. B. Lippincott Company, and our relationship has been very cordial." According to Follett's testimony, except for the delay for "a very short intervening space" in the fulfillment of the two orders referred by Lippincott on September 29 and October 7, 1936, there was no other instance of even delay in Lippincott's fulfillment of a Wilcox & Follett order down to the time of the hearing before the Commission in 1940 on the complaint which was not filed until August 26, 1938.

Assuming for the sake of argument that the testimony is sufficient to justify an inference that Lippincott's reference of the two orders on September 29 and October 7, 1936, was but a subterfuge availed of to prevent Wilcox & Follett from obtaining medical books, it is by no means an exclusive inference. Equally permissible is the inference that the reference by Lippincott of the two particular orders was but in pursuance of its long established practice to refer some orders while filling others direct and was not designed to deny the customer its requirements. If it be suggested that the prior status could no longer be deemed to obtain after the Chicago Medical Book Company's letter of September 19, it is also a fact that Lippincott plainly ignored the suggestion in that letter by filling and billing direct, between September 25 and October 12, 1936, four other orders of Wilcox & Follett for medical books. Furthermore, while the letter of September 19 stated the Chicago Medical Book Company's intention not to do further business with Wilcox & Follett, it did not say that they would refuse to honor an order referred by Lippincott to be filled from the books which it had there on consignment. The Commission asserts that the four orders filled and billed direct "slipped by". But why should four orders out of six over the critical period be assumed to have "slipped by" and the two remaining orders be conclusively presumed to have been referred for an ulterior purpose? If, in referring the two orders, Lippincott was acting to prevent Wilcox & Follett from obtaining medical books, why then did it fill contemporaneously four other orders? In fact, Lippincott filled an order of Wilcox & Follett on one day (October 7) and on the same day referred another order of the same company.[3]

The Commission's conclusion that Lippincott participated in carrying out the unlawful combination charged by the complaint stems from the erroneous assumption (Commission's brief, p. 34) "that the

[3] The referred order of October 7, 1936, was for one copy of a book, the list price whereof, less discount, was $3.75.

494

petitioner [Lippincott Company], the other respondent publishers and Chicago Medical Book Company all discontinued sales and discounts to Wilcox & Follett Company at about the same time; * * *." Actually, Lippincott did not discontinue sales and discounts to Wilcox & Follett at any time. Even the two orders referred to the Chicago Medical Book Company on September 29 and October 7, 1936, were filled by Lippincott direct to Wilcox & Follett as soon as the latter made known to Lippincott that the Chicago Medical Book Company had not filled those orders. The Commission argues that offenses cognizable by the Federal Trade Commission are not to be atoned by repentance after a proceeding for their correction has been instituted. So much may readily be conceded. But that does not mean that the prompt correction of what might have appeared to be an offense or, possibly, could have become an offense, if uncorrected, is to be robbed of its evidential value as clarification or exculpation merely because the Commission at some later date seeks to take cognizance of the matter. Here the only things complained of, which certainly did not amount to a refusal by Lippincott to sell medical books to Wilcox & Follett, occurred more than a year and nine months prior to the filing of the complaint in this case, during all of which time Wilcox & Follett met with no difficulty in buying medical books direct from Lippincott Company. The cases cited by the Commission in this connection involve efforts by offending parties to exculpate themselves by corrective action taken after proceedings for the eradication of the offenses have been instituted. Such is not the instant case.

The Commission also makes point of the fact that Widmer, sales manager of Lippincott Company's medical book department, in letters to Wilcox & Follett alluded to Chicago Medical Book Company as Lippincott's exclusive agent in Chicago for the sale of certain medical books, which was not the fact. Phillips, who succeeded Widmer as sales manager of Lippincott's medical book department and who testified at the hearing as a witness for the Commission, made plain that Lippincott merely had some medical books on consignment with the Chicago Medical Book Company without any exclusive agency, as the Commission concedes (its brief, p. 33). Widmer had died prior to the hearing so that what his understanding of Lippincott's relation to the Chicago Medical Book Company may have been was not open to further explanation by him. But, even inferring from his letters most strongly against the petitioner, there is still no substantial evidence to support an inference that Lippincott refused to sell medical books to Wilcox & Follett. The Widmer letters neither stated nor suggested any such refusal and, as we have already seen, the other evidence in the case introduced by the Commission showed uniform fulfillment by Lippincott of Wilcox & Follett's orders even including the two referred orders which Chicago Medical Book Company refused to fill.

■■ The evidence relied upon by the Commission for its basic primary inference of a refusal by Lippincott to sell medical books to Wilcox & Follett supports just as readily an inference of innocent intent on the part of the Lippincott Company. Evidence which is entirely circumstantial and which equally supports either of two opposed or inconsistent inferences cannot of itself be deemed to furnish substantial support for one of such inferences to the exclusion of the other. See Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct. 391, 77 L.Ed. 819, and cases there cited. In connection with findings of an administrative body, it was said in Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989, that evidence "which gives equal support to inconsistent inferences" is not substantial. See also National Labor Relations Board v. Sun Shipbuilding & Dry Dock Co., 3 Cir., 135 F.2d 15. Applying these principles to the facts of the instant case, it follows that the Commission's finding that the Lippincott Company subscribed to and helped carry out an agreement not to sell medical books to Wilcox & Follett is not supported by substantial evidence.

The case against the petitioner with respect to the sale of medical books to Login Brothers is wholly lacking in any evidence that the petitioner agreed with anyone not to sell medical books to Login Brothers or that it ever refused to sell to them. The Commission concludes generally in its twentieth finding of fact that "The methods used by respondents in preventing Login Brothers from securing their supplies were essentially the same as in the case of Wilcox & Follett Company." The relative insufficiency of any basis for that conclusion is the more marked when we consider

that there was no meeting of the alleged conspirators in the case of Login Brothers such as the Kansas City meeting with respect to Wilcox & Follett and that there was no letter from Chicago Medical Book Company to the respective publishers stating its intention not to do any further business with Login Brothers.

The evidence with respect to a refusal to sell medical books to Login Brothers consists entirely of conversations which each of the two Login brothers had separately with Speakman, president of the Chicago Medical Book Company, wherein the latter is said to have told them that they were selling too many books, that the Chicago Medical Book Company could sell the books without their assistance and that the Chicago Medical Book Company would not sell them any more books; that the last sale by the Chicago Medical Book Company to Login Brothers was on December 26, 1937; and that by letter to Login Brothers dated January 3, 1938, the Lippincott Company stated that it was forwarding to the Chicago Medical Book Company for their attention an order of December 31 from Login Brothers, for which the Lippincott Company thanked them "kindly". It is on the basis of the reference of this one order that the Commission concludes that the petitioner was a party to a conspirative agreement not to sell medical books to Login Brothers and that it had by its reference on January 3, 1938, of Login Brothers' order refused to sell to them. Yet there was no evidence that the Lippincott Company was ever informed of the Login Brothers' conversations with Speakman or that it knew that the Chicago Medical Book Company would not sell to Login Brothers. Nor was there any evidence that either Login Brothers or the Chicago Medical Book Company ever notified the Lippincott Company that the order from Login Brothers referred by Lippincott on January 3, 1938, to Chicago Medical Book Company was not filled. The next thing that Lippincott heard from Login Brothers was an order from them in July, 1939, which Lippincott filled. The evidence was wholly insufficient to support a finding that the petitioner agreed with Chicago Medical Book Company and the Mosby Company or anyone else not to sell medical books to Login Brothers or that the petitioner ever refused to sell to Login Brothers.

In the view we thus take of the case, it is unnecessary for us to consider whether the order, which is made applicable to "scientific, educational or other books" in addition to books commonly known as "medical books", exceeds the scope of the complaint.

The order of the Commission in so far as it relates to the petitioner must be set aside.