BROSIOUS v. PEPSI-COLA CO. et al.
No. 8905.

Circuit Court of Appeals, Third Circuit.

Argued Oct. 11, 1945.

Decided April 19, 1946.

Miller Alanson Johnson, of Lewisburg, Pa., on the brief, for appellant.

Arthur T. Vanderbilt, of Newark, N. J. (Snyder, Hull, Leiby & Metzger and Walter H. Compton, all of Harrisburg, Pa., and G. Dixon Speakman and Herbert E. Armstrong, both of Newark, N. J., on the brief), for appellee Pepsi-Cola Co.

Robert Stinson, of Baltimore, Md. (Cloyd Steininger, of Lewisburg, Pa., and Ober, Williams & Stinson, of Baltimore, Md., on the brief), for appellee Cloverdale Spring Co.

Before ALBERT LEE STEPHENS, GOODRICH, and McLAUGHLIN, Circuit Judges.

STEPHENS, Circuit Judge.

In this action William G. Brosious prays a judgment for treble damages, interest thereon, and attorney fees, alleging an illegal conspiracy between two corporations, Pepsi-Cola Company and Cloverdale Spring Company, defendants. Anti-Trust Laws, 15 U.S.C.A. § 15.

At the conclusion of the plaintiff's case, the trial court granted defendants' motion to dismiss the action, holding that the evidence introduced did not support the allegation that a conspiracy had been entered into between the two defendants in unreasonable restraint of trade. No decision was made as to the allegation that the combined transactions of the two defendants were in interstate commerce. Brosious appeals.

The Pepsi-Cola Company is the owner of the registered trade name and trade-mark "Pepsi-Cola" and is the manufacturer or compounder of a certain "concentrate" or syrup made in conformity with a so-called secret formula, which, when combined with sugar and carbonated water, is bottled and sold as a beverage called Pepsi-Cola. Pepsi-Cola Company contracted with Cloverdale Spring Company as its exclusive bottler and distributor of "Pepsi-Cola" for Pennsylvania and other territory. Under the contract the Pepsi-Cola Company sold and shipped its "concentrate" in ten-gallon containers from Long Island, New York, to the Cloverdale Spring Company at Newville, Pennsylvania, where it was warehoused until mixed and bottled as the trade demanded the beverage through jobbers, salesmen and distributors.

The contract between Pepsi-Cola Company and Cloverdale Spring Company, appointing the latter " * * * its exclusive bottler * * *," was in reality an appointment as exclusive distributor in the territory named therein for the trade-marked soft drink called "Pepsi-Cola." Briefly stated, the contract provides for the following: The distributor must comply with law; confine its representations to those authorized by Pepsi-Cola Company; purchase the concentrate, the bottles, bottle caps and labels used at fixed prices from Pepsi-Cola Company; mix the ingredients exactly and only as directed by Pepsi-Cola Company; "push vigorously" the wholesale output of Pepsi-Cola at a price fixed by Pepsi-Cola "to the satisfaction of Pepsi-Cola"; and distribute only Cloverdale products. The contract is assignable upon approval of both parties to it.

For a period of about six years or until April, 1941, Cloverdale sold bottled Pepsi-Cola to Brosious for cash at its plant at Newville, Pennsylvania, who resold and distributed it in territory prescribed by Cloverdale within the State of Pennsylvania. Brosious also purchased and re-sold non-alcoholic beverages other than Pepsi-Cola. Sometime in April, 1941, Cloverdale

refused to continue supplying Pepsi-Cola to Brosious. Negotiations ensued, in which Cloverdale demanded that Brosious should take at least three counties in Pennsylvania in addition to his former territory, paint his trucks a prescribed color and distribute only the products of Cloverdale. Brosious did not approve of these requirements and took his objections to the officers of Pepsi-Cola Company in New York but to no purpose. He was informed, however, that it was not the policy of Pepsi-Cola Company to tell their "franchise bottlers" what to do, but that when sales drop off in any particular territory, it "steps in," and that it follows the policy of backing up its franchised bottlers and would do so in this case. Brosious refused the proposals and thereafter brought this action, claiming that appellees were acting in conspiracy, and contrary to the law as provided in the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15, " * * * to procure, monopolize and keep within their control to the greatest extent possible * * *" the wholesale distribution of Pepsi-Cola syrup.

At the beginning it is well to note that there is no interlocking directorate or other financial connection as existing between Cloverdale and Pepsi-Cola.

The relief prayed for is based upon 15 U.S.C.A. § 15, which provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Section 1 of the Sherman Act, 15 U.S.C.A. § 1, provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal; * * *." Section 2 of the Act, 15 U.S.C.A. § 2, provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor."

It will be noted from the above sections of the anti-trust laws that the combinations, acts in restraint of trade, or conspiracy must be concerned with "commerce among the several States, or with foreign nations." Brosious alleges and argues that Cloverdale's refusal to sell Pepsi-Cola to him except under the terms hereinbefore set out, together with the Pepsi-Cola's treatment of the situation when he presented it to its officers in New York, all in the light of the contract existing between Cloverdale and Pepsi-Cola, constitutes a conspiracy condemned by the Sherman Act. Pepsi-Cola and Cloverdale contend on the contrary that there is nothing in the situation touching interstate commerce and that there is no conspiracy in the premises, nor has there been any act performed by either or both appellees tending to unreasonably restrict trade or commerce.

It appears to us that the first detail to be considered in determining whether or not the facts of the case constitute interstate commerce, or whether or not the facts show an illegal restraint of trade, is the interrelation of Pepsi-Cola and Cloverdale. As we view it, there is nothing in the evidence which by any reasonable interpretation tends to or supports an inference that Pepsi-Cola and Cloverdale were acting in concert in refusing to sell to Brosious. Pepsi-Cola and Cloverdale are two entirely separate and distinct enterprises. It is not asserted that Pepsi-Cola is without the unqualified right to make a contract whereby it sells its product to be distributed under reasonable conditions calculated to protect the good reputation of its product which is sold under a trademarked name. And this right is not affected one way or another by the interstate or intrastate character of the commerce involved. The citation of a very few authorities will suffice upon this point.

In Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., 2 Cir., 1915, 227 F. 46, 49, the right to sell to none or to all is upheld. "Before the Sherman Act it was the law that a trader might reject the offer of a proposing buyer, for any reason that appealed to him; it might be because he

did not like the other's business methods, or because he had some personal difference with him, political, racial, or social. That was purely his own affair, with which nobody else had any concern. Neither the Sherman Act, nor any decision of the Supreme Court construing the same, nor the Clayton Act, has changed the law in this particular. We have not yet reached the stage where the selection of a trader's customers is made for him by the government." See Jax Beer Co. v. Redfern, 5 Cir., 1941, 124 F.2d 172.

In Union Pacific Coal Co. v. United States, C.C., 1909, 173 F. 737, 740, it is said: "If the necessary effect of a combination to engage in or conduct interstate or international commerce is but incidentally and indirectly to restrict competition therein, while its chief result is to foster the trade and to increase the business of those who make and operate it, it does not fall under the ban of this [anti-trust] law. [Authorities cited.]"

■ It is the right, long recognized, of a trader engaged in a strictly private business, freely to exercise his own independent discretion as to the parties with whom he will deal. United States v. Colgate & Co., 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; Mennen Co. v. Federal Trade Commission, 2 Cir., 1923, 288 F. 774, 780, 30 A.L.R. 1120; Wholesale Grocers' Ass'n v. Federal Trade Commission, 5 Cir., 1922, 277 F. 657, 664; Coca-Cola Bottling Co. v. Coca-Cola Co., D.C.Del., 1920, 269 F. 796; J. B. Lippincott Co. v. Federal Trade Commission, 3 Cir., 1943, 137 F.2d 490, 495; Pittsburgh Plate Glass Co. v. Jarrett, D.C.Ga., 1942, 42 F.Supp. 723, 734.

■ We conclude that the contract between the appellee corporations, independent of the interstate commerce, was not of itself offensive to the monopoly phase of the Sherman Act.

Brosious, upon meeting with the situation described, appealed to officers of Pepsi-Cola Company, and he contends that the treatment accorded him, together with the contract and the refusal of Cloverdale to sell to him, proves the conspiracy alleged.

■ We are unable to make anything more out of the interviews with Pepsi-Cola officials than that they do not interest themselves with the distributor's business so long as he adheres to the contract and the volume of business is regarded by them as satisfactory. Such a policy is not unusual and is simply good business in a competitive economy. See Arkadelphia Milling Co. v. St. Louis S. W. R. Co., 1919, 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517. We are entirely in accord with the trial judge, in saying, "it is my opinion that the evidence will not support a finding, that a conspiracy existed between The Cloverdale Spring Company and Pepsi-Cola Company pursuant to which sales of Pepsi-Cola to the plaintiff were discontinued." And we repeat that there is no evidence in the record of any monopolistic practice or unreasonable restraint of trade, interstate or intrastate, in the operation of the two corporations under the contract.

■ In reaching its decision the trial court was fully aware of the fact that to pass upon the point, the jurisdictional question must be passed in some manner. The statutory basis for federal court jurisdiction is that the acts complained of must be interstate in character. The court met the contingency by assuming, but specifically noting that it was not deciding, that the transaction was in interstate commerce. The authorities cited by the court in support of its decision that there was no conspiracy are Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 500, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Trenton Potteries Co. v. United States, 2 Cir., 1924, 300 F. 550, 553; Whitwell v. Continental Tobacco Co., 8 Cir., 1903, 125 F. 454, 64 L.R.A. 689, and others.

We regard it as desirable to decide whether or not the transitional steps from shipment of the syrup to delivery of the bottled beverage to Brosious under the Pepsi-Cola—Cloverdale contract in their total, comprise an instance of interstate commerce. Some, if not all, of the authorities used herein, as to the monopolistic issue, are more or less applicable to the interstate issue, and we wish them considered in conjunction with those which follow.

The contract here in question was made in Pennsylvania. The concentrate, a principal ingredient of the completed article of commerce, was shipped from New York to warehouse in Pennsylvania, where the article of trade was compounded and packaged. Did the interstate movement of the concentrate end when the ten-gallon containers of concentrate were received at Cloverdale Spring Company's plant; or did it, in its transition with other substances into a bottled and labeled beverage sold to the trade, continue in the flow of interstate commerce? We are of the opinion that the interstate movement ended with the containers resting in Cloverdale's warehouse.

We find the following language in the Supreme Court's opinion in Schechter Corporation v. United States, 1935, 295 U.S. 495, 543, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947: " * * * The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use * * *."

The case of Lipson v. Socony Vacuum Corporation, 1 Cir., 1937, 87 F.2d 265, 266, 267, is one for treble damages under the Sherman Act, alleging discrimination in price. The court said: " * * * all gasoline brought into the northeastern territory by the defendants [from one state into another] remains in interstate commerce until it is delivered into the storage tanks of the retailer. While it is clear that the defendants must keep a supply on hand in their storage tanks to meet the fluctuations of demands of retailers, an anticipated demand by retail customs is not sufficient to render shipments a transaction in the course of interstate commerce until delivered to the customer whenever a demand arises * * *."

There is apt language in Jewel Tea Co. v. Williams, 10 Cir., 1941, 118 F.2d 202, 207. "Where goods are ordered and shipped in interstate commerce to meet the anticipated demands of customers without a specific order therefor from the customer and the goods come to rest in a warehouse, the interstate commerce ceases when the goods come to rest in the state. It does not continue until the demand eventuates in the form of an order and the merchandise is delivered to the retailer." [1]

Again the following in Walling v. Goldblatt Bros., 7 Cir., 1942, 128 F.2d 778, 782, is said: " * * * Here, once the goods reached the warehouses, they assumed a wholly local character. The function of the warehouses was to furnish activities and means for the conduct of a relatively local retail business conducted by one company. This function was that of an ordinary warehouse for a retail establishment and bears no resemblance to a 'throat' or a 'current of commerce.' Upon delivery to the warehouse, interstate commerce ceased * * *." [2]

It has been stated that interstate commerce terminates at a point where the parties concerned intended that it should end, i. e., it ceases at the point of its destination and has been delivered to the consignee. See Danciger v. Cooley, 1919, 248 U.S. 319, 39 S.Ct. 119, 63 L.Ed. 266; Binderup v. Pathe Exch., 1923, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308. When a substance is transported from one state into another, the interstate movement ends with the delivery of that substance to a distributing company. Subsequent sales and deliveries to customers of such company constitute intrastate commerce. East Ohio Gas Co. v. Tax Comm., 1931, 283 U.S. 465,

[1] Higgins v. Carr Brothers Co., 1942, 317 U.S. 572, 574, 63 S.Ct. 337, 87 L. Ed. 468; Chicago, Milwaukee & St. Paul R. Co. v. State of Iowa, 1913, 233 U.S. 334, 342–343, 34 S.Ct. 592, 58 L.Ed. 988; Kantar v. Garchell, 8 Cir., 1945, 150 F. 2d 47, 49; Atlantic Coast Line R. Co. v. Standard Oil Co. of New Jersey, 4 Cir., 1926, 12 F.2d 541, 60 A.L.R. 1456; C. S. Smith Metropolitan Market Co. v. Food & Grocery Bureau of Southern California, Inc., D.C.Cal., 1939, 33 F. Supp. 539.

[2] Atlantic C. L. R. R. v. Standard Oil Co., 1927, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270; Winslow v. Federal Trade Commission, 4 Cir., 1892, 277 F. 206, certiorari denied 258 U.S. 618, 42 S. Ct. 271, 66 L.Ed. 793; Gerdert v. Certified Poultry & Egg Co., D.C.Fla., 1941, 38 F.Supp. 964.

471, 51 S.Ct. 499, 75 L.Ed. 1171; State v. Bartles Oil Co., 1916, 132 Minn. 138, 155 N.W. 1035, L.R.A.1916D, 193. Also, see "original package" cases, People ex rel. Burke v. Wells, 1908, 208 U.S. 14, 28 S.Ct. 193, 52 L.Ed. 370; State v. C. C. Taft Co., 1920, 183 Iowa 548, 167 N.W. 467, 9 A.L.R. 390, writ of error dismissed in 252 U.S. 569, 40 S.Ct. 345, 64 L.Ed. 720; Baltimore & O. R. Co. v. United States, D.C.N.Y., 1936, 15 F.Supp. 674. See Rottschaffer on Constitutional Law p. 321.

Appellant relies heavily upon Bedford Co. v. Stone Cutters Ass'n., 1927, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791. We think that case does not help appellant upon any point. Workmen refused to handle building stone produced in an out-of-state quarry and were met with an injunction. The stone had come to rest after shipment in interstate commerce. The strikers had no direct objection to handling the stone on hand, and it was not claimed in the case that the refusal to handle it was of itself illegal. The strikers refused to handle it because such action would decrease the demand for further supply of stone, with the probable, or hoped for, result of forcing better working conditions for fellow workmen in the quarry through economic pressure. The very means employed directly affected and retarded the natural flow of interstate commerce. In our case the contract between the corporations was for the purpose of sustaining or increasing the demand for the beverage in a competitive market, and not in any way to effect a monopoly in the beverage trade. Neither the terms of the contract nor the proved action under it impresses Cloverdale's dealings with Brosious with the status of interstate commerce.

We hold that the transactions complained of in the instant case were not in interstate commerce, that they did not illegally restrain or restrict trade, or tend to create monopoly, that there was no illegal agreement between defendants, and that defendants committed no acts in the nature of a conspiracy to violate the anti-trust or other laws. Taken as a whole the action appears to be based upon a private controversy rather than upon one affecting the public as such, a necessary element of the laws which are herein attempted to be invoked.

Affirmed.